Marvin **LUSTIGER**, Appellant,

v.

**UNITED STATES** of America,
Appellee.

No. 20967.

United States Court of Appeals
Ninth Circuit.

Nov. 16, 1967.

Certiorari Denied March 4, 1968.
See 88 S.Ct. 1042.

**133**

Burton Marks, (argued), Beverly Hills, Cal., for appellant.

Edward E. Davis, U. S. Atty., JoAnn D. Diamos, Asst. U. S. Atty., (argued), Tucson, Ariz., for appellee.

Before CHAMBERS, HAMLEY and ELY, Circuit Judges.

HAMLEY, Circuit Judge:

This is a mail fraud case involving the real estate activities of Marvin Lustiger in Mohave County, Arizona. The grand jury returned a nineteen-count indictment against Lustiger for violations of 18 U.S.C. § 1341 (1964), between September 7, 1960, and the filing of the indictment on October 25, 1963. Each count charged him with mailing a letter or printed matter to a named individual in furtherance of a scheme to defraud such person. The mailings occurred at various times between February 28, 1961 and April 7, 1963. Counts IX and X were thereafter dismissed. After a non-jury trial the district court convicted Lustiger on the remaining seventeen counts. Lustiger then took this appeal.

Appellant's primary contention is that the evidence adduced at the trial was insufficient to support the trial court's finding and conclusion that he engaged in a scheme to defraud or obtain money by means of false or fraudulent pretenses, representations or promises. It was stipulated prior to trial that appellant used the mail in connection with his land sales.

Since this is an appeal from a determination of guilt, we must view the

evidence and all reasonable inferences therefrom in the light most favorable to the Government. Kaplan v. United States, 9 Cir., 329 F.2d 561.

Lustiger's real estate activities in Mohave County, Arizona, got under way on September 7, 1960, when he formed the Lake Mead Land and Water Company (company), an Arizona corporation. Lustiger and his family owned all of its stock and he, alone, was responsible for the policy-making and management of the company. The company thereafter acquired ownership or options to purchase approximately sixty-four sections of land in Mohave County, about sixty miles from Kingman, Arizona.

These sections consisted of the odd-numbered sections in a checkerboard pattern, the even-numbered sections being owned by the federal government. The company subdivided twenty of these sections, consisting of 9,844 acres, into 6,548 parcels. The company then offered to the public, for sale, all or part of eleven of these sections, consisting of 6,400 acres subdivided into 4,247 parcels. The company called this unincorporated subdivision "Lake Mead City."

In its sales operations, the company utilized the United States mails Lustiger organized Arizona Associated Advertising Agency to handle the advertising for the company. The company, through Lustiger, informed all customers that mail should be sent to the company at P.O. Box 13349, Phoenix, Arizona.

Actually, the company had only a part-time employee to receive and send mail from that address. This employee forwarded all mail received to Lustiger at Azusa, California. After receipt, Lustiger processed the mail through his National Land Company and returned it to Phoenix by bus. The part-time employee then placed the correspondence in the mail. All checks were cashed at a Phoenix bank.

Lustiger caused the company to advertise its property in newspapers and other publications throughout the country. Those who answered were sent an "Investor's Kit," consisting of a thirty-two page color brochure, a "Fact Sheet," and a land reservation form. If the reservation form was returned to the Phoenix Post Office box with a ten dollar refundable deposit, Lustiger caused the company to send the customer a vicinity map on which was marked his subdivision unit (section) and a plat map showing his individual parcel, together with a purchase contract for execution.[1]

Land which cost Lustiger from $33.20 to $125 an acre was in this way sold in one and a quarter acre parcels for from $395 to $495. In the "Lake Mead City Building Area," the price was $695 for one and a quarter acres.

As part of the company's policy to provide its customers with a "gilt-edge" to their investment, the company, through Lustiger, maintained both an exchange policy and a refund policy. Under the exchange policy, customers who had purchased lots in the ten units within which the company had not installed roads, staked lots, or provided parcel identification markers, could trade for property in the "improved" building area. The trade cost the customer nothing, provided he built within five years of the exchange; otherwise, the customer only received credit for his equity in the unimproved unit against the higher purchase price for a lot in the building area. Under the refund policy, if for any reason a customer changed his mind or was not completely satisfied within thirty days, his money was returned without question.[2]

---

1. Sometime after the project got under way, customers were furnished with certain additional materials. These included a copy of the May, 1962 *Arizona Highways* magazine, containing a map of the general area; a "price increase notification sheet"; a "newsletter"; a "land investment" sheet; and the official Arizona State Highway Department 1962 road map.

2. Additionally, on April 29, 1963, which was more than five months after Lustiger became aware that his activities were under investigation by the Post Office Department, the company mailed to all of

The advertising brochure which Lustiger had the company distribute, entitled "Join Us for Pleasure and Profit at Lake Mead City," contained numerous statements describing the asserted advantages of Lake Mead City. In addition, the brochure contained many photographs purporting to depict scenes in the area. Sales generated by this extensive advertising program continued until May, 1962. At that time the advertising campaign was discontinued as the result of litigation over the company's title to the land. By March 10, 1962, three thousand lots had been sold.

Paragraphs 7 through 11 of Count I of the indictment, made applicable to all counts, charge that Lustiger's advertising materials contained misleading, deceptive, false and fraudulent pretenses, representations and promises concerning the property. These paragraphs further charge that these alleged misleading, deceptive, false and fraudulent pretenses were part of a scheme by Lustiger to defraud land purchasers.

The alleged verbal and photographic statements of this kind pertained to such matters as investment potential, status as a "planned community," desirability of location, favorable deed restrictions, character as a "resort area," quality as compared to other Arizona land, proximity to Lake Mead National Recreation Area, proximity to water sports, presence of a "Joshua tree forest," access, proximity to Kingman, Arizona, availability of power and telephone facilities, adequacy of domestic water supply, surveys and platting, existence of houses in the Lake Mead City development, care taken in choosing lots for individual purchasers, prospective price increases because of rapidly increasing values, and scarcity of remaining lots.

In addition to statements of the kind described above, the indictment charges that Lustiger failed to disclose the following material facts: all units of the development were located in odd-numbered sections, widely scattered in five different townships; the alternate even numbered sections, owned by the federal government, were used for grazing; many units had rocky hills and unbridged natural drainage washes; only a few units had convenient access; the nearest available power and telephone lines were many miles away; most units did not have street signs, lot corner markers or lot identification markers; and some units were many miles from a domestic water supply.

On this appeal Lustiger argues that some of the asserted statements and concealments listed above did not involve material facts. As to the remainder, Lustiger contends the evidence failed to establish that the representation of a material fact was false, or that a material fact had been fraudulently concealed. Further, he contends that all the statements constituted only "seller's puffing," and were not sufficient to establish a scheme to defraud land purchasers.

▮ Lustiger did not request the trial court to find the facts specially, as he might have done under Rule 23(c), Federal Rules of Criminal Procedure, and no special findings were entered. It follows that we must assume that the trial court found in favor of the Government with respect to each and every alleged statement or concealment relied upon by the Government.

its customers a refund offer, with which the company strictly complied. This offer was as follows:

" * * * any customer who inspects Lake Mead City prior to September 1, 1963, and is then dissatisfied with his purchase for any reason whatsoever, will be given the right at that time to sign a request for a full refund at the Information Office on the property, and that all such requests so signed at that time will be honored. If for any reason you may be unable to visit Lake Mead City this summer, please notify the company within the next fifteen days and a reasonable extension to this offer will be granted. The company very much would like to keep every one of its valued customers, but most of all, the company wants them all happy."

This being the case, Lustiger cannot obtain reversal on the ground that some of the representations or concealments of material fact relied upon by the Government were not proved to be false, misleading or deceptive. As long as a sufficient number of the statements were shown to be knowingly false, deceptive or misleading to permit the trial court to infer that defendant intentionally engaged in a scheme to defraud, the conviction must be affirmed. Ballard v. United States, 9 Cir., 138 F.2d 540, 545.

One of the categories of alleged misleading, deceptive and false statements contained in Lustiger's advertising materials relates to the availability of water, both for recreational and domestic uses. The color brochure contains numerous photographs, most of which depict water scenes on or around Lake Mead. The lake is said to be only five miles from Lake Mead City. Other photographs show small lakes and ponds, purportedly located within the boundaries of Lake Mead City. One body of water is colorfully described as the "Favorite swimming hole." Another picture shows a large metal water tank lying horizontally alongside a windmill, with the printed declaration: "IMPORTANT! Plenty of Water." A vicinity map "Depicting Lake Mead City Area," distributed by Lustiger, shows two wells, three springs and a water pipe line.

Lustiger does not deny that these representations were made, nor does he question the materiality of the facts presented. He argues, however, that the court's presumptive finding that the representations were misleading, deceptive and false was not supported by the requisite degree of proof.

Our examination of Lustiger's advertising materials reveals that the statements, photographs and maps, unaccompanied by true statements concerning the lack of available water, could reasonably have led a person of average intelligence and experience to believe that all parcels offered for sale had reasonable access to a water supply.[3] While the statements in the advertising materials may not have been literally false, taken as a whole they were fraudulently misleading and deceptive.

It is true that, measured by a straight line, Lake Mead is only five miles from the boundary of Lake Mead City. However, Lustiger did not reveal that by existing roads Lake Mead is fifteen miles from the nearest and forty miles from the farthest Lake Mead City unit. Moreover, most of the units did not have access presently available by ordinary motor vehicles. Thus, a purchaser may in fact have a long, if not impossible, route to travel to enjoy the benefits of Lake Mead.

Likewise, all the water scenes in Lustiger's brochure were taken within the boundaries of Lake Mead City. Undisclosed to the prospective purchaser, however, was the fact that none of the pictured bodies of water were on land owned or optioned by Lustiger's company. These photographs were taken at the Diamond Bar Ranch which is near the center of the general area where Lake Mead City is located. There was evidence that a few children had used the pictured water pond for swimming. The foreman of this ranch testified, however, that the "Favorite swimming hole" depicted in the brochure was not a swimming hole but was a dirt stock tank for

3. This is not to say that representations and concealments will necessarily pass muster if they do not deceive a person of average intelligence and experience. In Lemon v. United States, 9 Cir., 278 F.2d 369, 373, this court said:
"It is immaterial whether only the most gullible would have been deceived by this technique. Section 1341 protects the naive as well as the worldly-wise, and the former are more in need of protection than the latter. United States v. Sylvanus, 7 Cir., 192 F.2d 96, 105. As a matter of fact, ' * * * the lack of guile on the part of those solicited may itself point with persuasion to the fraudulent character of the artifice.' Norman v. United States, 6 Cir., 100 F.2d 905, 907."

stock water with perhaps two feet of mud on its bottom.

The vicinity map depicting several sources of water for domestic use follows a similar pattern of deception. Lustiger failed to disclose that the only source of water on the property owned by the company and available to purchasers during the period charged in the indictment was the Clearwater Well, located in the far northwest corner of the Lake Mead City units, a distance of twenty-eight miles from some subdivision units.[4] In order to obtain water for domestic use, practically all lot purchasers would have to haul their water from the Clearwater Well and provide storage on their own lots. Moreover, as noted above, most of the subdivision units were not accessible by ordinary motor vehicles.

This same pattern of fraudulent deception runs through much of Lustiger's advertising materials.

The brochure informed prospective purchasers that all parcels had been platted and recorded, "with road easements laid out to assure you of access." Although the accompanying "Fact Sheet" warned that no streets were presently available, prospective customers were not told that the terrain in many of the units made actual construction of a road physically impracticable or unreasonably expensive. Customers were not advised that, except in the building area, no street or lot markers existed to enable a purchaser to determine the location of his lot or the boundaries of his road easement.

The brochure stated that all Lake Mead City properties "are within the franchised area of Citizen's Utilities Company, with regard to power and telephone." This statement is literally true. But to one who had not inspected the property, this would indicate that power and telephone service could be made available by a reasonable expenditure. Although the "Fact Sheet" stated that utilities were not presently available,

Lustiger failed to disclose that the nearest existing electric power lines and telephone lines are approximately twenty-one miles from the nearest, and thirty-eight miles from the farthest of the Lake Mead City subdivision units. According to the testimony, Lake Mead Land and Water Company would not pay the cost of bringing electric power or telephone lines to any of the units in the subdivision.

The brochure described the real estate development as "Lake Mead City * * * an enchanted city in the making * * *," and advised: "Lake Mead City, Arizona's best located planned community," "Lake Mead City planning and restrictions assure you of properties that will always be favorably looked upon by discriminating purchasers," "Now, for only pennies a day, you can participate in one of the best planned and fastest selling resort areas in Arizona."

The trial court was warranted in finding that the use of the words "Lake Mead City" in the subdivision name, taken in conjunction with the phrases quoted above were intended to mislead prospective customers into believing that a planned city or community had already been started and was rapidly growing.

In fact, no city or community of residents, or building improvements of any kind, were in existence up to March, 1963, except for a small field office used by the company and a temporary dwelling occupied by a guide and caretaker. By the time of the trial, five houses were in various stages of completion in Lake Mead City. There was no plan to construct or provide housing or shopping facilities, or provide the utilities necessary to the development of a planned city or community. The company apparently did plan to install additional rough dirt streets, street signs, lot stakes and identification markers, but little had been done on this. There were no permanent occupants in any of the subdivision units.

---

4. After the indictment was returned the company acquired another well and built a water tank. It also obtained options on other water resources.

Moreover, none of the maps distributed by Lustiger indicated what land within the boundaries of the Lake Mead City area was actually owned by the company and was intended to become a part of the "city." Customers were not informed that the company owned only the odd-numbered sections, the even-numbered sections belonging to the federal government for grazing, mining and recreational purposes. Of the 186 sections pictured in Lustiger's vicinity map as "Depicting the Lake Mead City Area," only eleven sections, widely scattered geographically in five different townships, were actually offered for sale to the public. Finally, customers were not told that large washes, rocky hills, and steep cliffs separated many of the subdivision parcels, making reasonable travel between them in the future highly unlikely.

The story is the same with regard to other matters of interest to one considering the purchase of property in a rural subdivision. The evidence is overwhelming that Lustiger's advertising materials were in some respects false and, apart from falsity were, when considered as a whole, fraudulently deceptive and misleading, exhibiting an intent and purpose to defraud.

If a scheme is devised with the intent to defraud, and the mails are used in executing the scheme, the fact that there is no misrepresentation of a single existing fact is immaterial. It is only necessary to prove that it is a scheme reasonably calculated to deceive, and that the mail service of the United States was used and intended to be used in the execution of the scheme.[5]

Moreover, deceitful statements of half truths or the concealment of material facts is actual fraud violative of the mail fraud statute. Cacy v. United States, 9 Cir., 298 F.2d 227, 229; Williams v. United States, 10 Cir., 368 F.2d 972, 975. In addition, as the Tenth Circuit said in Gusow v. United States, 10 Cir., 347 F.2d 755, 756, the deception need not be premised upon verbalized words alone. The arrangement of the words, or the circumstances in which they are used may convey the false and deceptive appearance.

Lustiger argues that the above-mentioned advertising statements constitute "seller's puffing" and are not indictable under the mail fraud statute. While it is true that exaggeration within reasonable bounds under the circumstances will not support a finding of a scheme to defraud, a substantial deception, as evidenced here, is sufficient. Moreover, here prospective buyers were expected to rely almost entirely on the advertising materials in making their purchase. Only a few buyers saw the property before signing the purchase contract. Under these circumstances courts cannot be blind to the increased potential for a fraudulent scheme to trap the unwary.

Lustiger also argues that his refund and exchange policies negate any finding of fraudulent intent. We disagree. While such policies may be evidence of good faith, they do not necessarily negate a finding of bad faith. See United States v. Sylvanus, 7 Cir., 192 F. 2d 96, 105. Here the exchange policy was conditioned on building within a certain period of time, and the refund policy was limited to thirty days. Furthermore, as the evidence here reveals, disgruntled purchasers are not likely to take advantage of refund guarantees. Once the fraudulent character of the original purchase reveals itself, the integrity of the refund promisor, along with the purchaser's incentive to request a refund, evaporates.

We conclude that the evidence is sufficient to support a finding that Lustiger intentionally engaged in a scheme to defraud.

Lustiger contends that the trial court erred in denying his pre-trial motion to

5.  Irwin v. United States, 9 Cir., 338 F.2d 770, 773; Lemon v. United States, 9 Cir., 278 F.2d 369, 373; Gregory v. United States, 5 Cir., 253 F.2d 104, 109; Kreuter v. United States, 5 Cir., 218 F. 2d 532, 535; Silverman v. United States, 5 Cir., 213 F.2d 405, 407.

suppress Government evidence on the ground that it was derived from an illegal "mail watch."

The motion was supported by an affidavit to the effect that a postal inspector had taken possession of mail addressed to Lustiger's Lake Mead City, as it arrived at the latter's Phoenix, Arizona, mail box and copied therefrom the names and addresses of Lustiger's customers. It was also alleged in the affidavit that all the evidence which the postal inspector thereafter procured from the customers derived from this asserted "mail watch."

A hearing was held before the trial court, with a reporter present, but Lustiger has not provided a transcript of that hearing for our use on this appeal. We must therefore assume, as the Government represents, that at the hearing the Government asserted that Lustiger's mail had not been delayed, and that this was conceded by Lustiger's counsel at the hearing. It is also to be noted that the affidavit filed in support of the motion to suppress did not allege delay.

In arguing the point on this appeal Lustiger relies upon the Fourth Amendment, 18 U.S.C. § 1703 (1964), and 39 C.F.R. § 3.1 (Dec. 6, 1961).

■■■ The protection against unreasonable search and seizure of one's papers or other effects, guaranteed by the Fourth Amendment extends to their presence in the mails. Ex Parte Jackson, 96 U.S. 727, 24 L.Ed. 877; Oliver v. United States, 8 Cir., 239 F.2d 818, 820–821, 61 A.L.R.2d 1273. Thus, first class mail cannot be seized and retained, nor opened and searched, without the authority of a search warrant. See Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652; Oliver, supra. However, the Fourth Amendment does not preclude postal inspectors from copying information contained on the outside of sealed envelopes in the mail, where no substantial delay in the delivery of the mail is involved. See Canaday v. United States, 8 Cir., 354 F.2d 849, 856.

■■ Likewise, a "mail watch" of the kind described above, involving no substantial delay, does not violate 18 U.S.C. § 1703 (United States v. Costello, 2 Cir., 255 F.2d 876, 881), or the postal regulations. United States v. Schwartz, 3 Cir., 283 F.2d 107.

■■ Lustiger argues that the trial court erred in denying his motion for disclosure of the minutes of the grand jury and, on the basis of that disclosure, for dismissal of the indictment.

In support of this motion counsel for Lustiger filed an affidavit alleging among other things, and upon information and belief, that: evidence concerning the indictment was presented to the grand jury on July 16, 17, October 24 and 25, 1963; of the twenty-three members of the grand jury, two attended none of these sessions; only seventeen attended the sessions held on July 16 and 17; only twenty attended the sessions held on October 24 and 25, the latter session being the one at which the jury returned the indictment; and the vote was fifteen for indictment and five against indictment.

Had the minutes of the grand jury disclosed the facts to be as stated in the affidavit referred to above, this would have provided no basis for dismissing the indictment. Individual grand jurors comprising more than a quorum attended all sessions, and were present when the vote was taken on the indictment. See United States ex rel. McCann v. Thompson, 2 Cir., 144 F.2d 604, 156 A.L.R. 240. Therefore the trial court did not err in denying the above-described motion.

Lustiger contends that the indictment is invalid in that it charged conduct which is protected by the First Amendment guarantee of freedom of speech. In support of this contention, Lustiger asserts that in framing its indictment the Government took out of context portions of statements contained in the advertising brochure and charged defendant with a fraudulent scheme based upon such segregated portions.

Lustiger's description of the indictment is inaccurate. It is true that, in

paragraph 7 of Count I, made applicable to all counts, nineteen separately-quoted statements attributed to Lustiger are characterized as "misleading, deceptive, false and fraudulent pretenses, representations and promises. * * *" But this paragraph also states that the quoted excerpts are contained in the advertising brochure, and that the presence of these statements therein was a "part" of the scheme and artifice to defraud. The fact-finder was not thereby invited to consider these statements out of context, nor did the Government adopt such a course at the trial. The Government's exhibit 37 series listed the six different printings of the brochure, a copy of each printing was made an exhibit so that the whole document could be examined by the trial judge who was the fact-finder.

Apart from his point that the fact-finder was asked to consider the quoted statements out of context, Lustiger seems also to be urging that the statements are not clearly fraudulent and are therefore protected by the First Amendment. This contention is answered by what we have said concerning the sufficiency of the evidence to support the finding of guilt.

Lustiger argues that the trial judge erred in excluding exhibits and opinion testimony concerning the activities of competing subdividers in Arizona, and exhibits relating to the activities of the Federal Bureau of Land Management in Arizona. Lustiger offered these materials for the threefold purpose of establishing the standards of the industry of which his company was a member, showing the value of the land in question, and to support defendant's position that the Government had failed to prove bad faith. The evidence was rejected on the ground that it lacked materiality.

The rejected exhibits bearing upon the activities of competing subdividers consisted of a compendium of ads and promotional materials used at the same time by other Mohave County subdividers in promoting Lake Mohave Ranchos, Lake Mead Ranchos, Meadview, Golden Valley and Paradise Acres.[6] Defendant states that this exhibit demonstrates that: (1) although every Mohave County subdivision has the same checkerboard pattern as that of Lustiger's Lake Mead City, not one of the competing subdividers advised this in their materials; (2) the competitors used imagination in the naming of their subdivisions that far outdid Lustiger's efforts in this direction; (3) all of the competitors displayed in their materials a flamboyancy that exceeds that of Lake Mead City's materials; and (4) the price of land in the nearby competing subdivisions greatly increased during the period charged in the indictment and in every instance exceeded Lake Mead City's price for its acreage.

The admission or exclusion of evidence of this general character, for the purposes described, rests within the sound discretion of the trial court. Whether, in a particular case, there was an abuse of such discretion depends upon the circumstances of the case.[7]

6. While these advertising materials were rejected, pictures of adjoining developments were admitted.

7. In United States v. Brandt, 2 Cir., 196 F.2d 653, 657, a mail fraud prosecution involving a drive for charitable contributions, it was held that the trial court erred in excluding evidence that, as defendant had done, a number of reputable charities retained professional fund raisers on a contingent basis. In United States v. Sprengel, 3 Cir., 103 F.2d 876, 881, a mail fraud prosecution involving a scheme to obtain funds from the "heirs" of the mythical Baker estate, it was held that the trial court properly permitted the prosecution to introduce evidence as to the activities of other "Baker estate" groups, known to the defendant. In Silkworth v. United States, 2 Cir., 10 F.2d 711, 720–721, a mail fraud prosecution involving the operation of a so-called bucket shop, it was held that the trial court did not err in permitting cross-examination of the defendant concerning the method of operation of other members of the same stock exchange, the purpose being to show that defendant was aware of the operations of his partnership. On the other hand, in United States v. Hofmann, 10 Cir., 353 F.2d 188, 191, a mail fraud prosecution involving a scheme to defraud purchasers of land, it was held that the trial

If, in our case, the tendered evidence concerning the real estate activities of competitors had been received, the Government would have been entitled to show the truth or falsity of these third-party advertising materials. The trial court could reasonably foresee that this would, in effect, lead to the trial of four or five other mail fraud cases, and could properly conclude that a fair trial of defendant's case did not require such collateral inquiries. The rejection of this evidence did not constitute an abuse of discretion.

We reach a similar conclusion, for substantially the same reason, with regard to the exclusion of exhibits relating to the Arizona activities of the Federal Bureau of Land Management.

The rejected opinion was that of Frank E. Glindmeier, former president of the Arizona League of Land Developers. The opinion was expressed in a letter, written by Glindmeier to Lustiger's trial counsel, which letter was conceded by the Government to be authentic. The gist of Glindmeier's opinion, as stated in this letter, was that the advertising representations and materials, sales techniques and devices used by Lake Mead City during 1961 and 1962 were:

" * * * well within the range of advertising representations and materials, sales techniques and devices generally and customarily deemed proper during that period, and generally and customarily used during that period by land subdividers who then were and now are considered entirely proper and ethical by the industry itself and the public as a whole."

What the custom among the land subdividers of the area was concerning advertising representations, sales techniques and related devices is immaterial. Likewise immaterial is the view which subdividers and the general public of the area then entertained concerning the ethics of the existing practice. It was for the trial court, as the fact-finder, to determine whether there was a scheme or artifice to defraud within the meaning of 18

U.S.C. § 1341. In making that determination the standards set up by Congress in that statute, and not those actually or assertedly held by subdividers and members of the public at the time and place in question, must govern.

Lustiger would be the first to object if his activities met the tests of section 1341, but he was convicted on evidence that competitors and the general public held to a higher standard. The principle behind such a justifiable objection works both ways—the only relevant test is that provided by the statute. The trial court did not err in excluding this exhibit.

Lustiger's contention that, in other respects, the trial court erred in admitting and excluding evidence has been examined, but we find no error.

Lustiger argues that the trial court erred in denying his motion to dismiss the indictment on the ground that it, and each count thereof, failed to state an offense against the United States, and on the further ground that each count of the indictment was duplicitous. He further argues that the trial court erred in denying his pretrial motions for discovery and inspection of documents and for a bill of particulars.

We have examined each of these arguments and find them to be without merit.

Finally, Lustiger argues that his conviction must be reversed for the reason that he was deprived of effective representation of counsel, in violation of the Sixth Amendment.

This contention was first made on September 27, 1966, in a motion for remand for a new trial on the ground of newly-discovered evidence. The motion was filed in this court by new counsel for Lustiger, the latter's trial counsel having been murdered by his wife on March 25, 1966. On October 24, 1966, another panel of this court denied, without prejudice, the motion for remand, with the suggestion that Lustiger file a motion for a new trial in the district court. The order further provided that if the district court then filed a statement in its

court properly excluded, as immaterial, evidence tending to show that the same

scheme had been previously used by others.

record that it wishes to hear the motion before disposition of the pending appeal, Lustiger could renew his motion in this court for a remand.

Lustiger filed such a motion for a new trial in the district court on January 5, 1967. On January 9, 1967, the district court entered a statement that it did not then want to hear the motion. Lustiger then renewed his motion for remand in this court, notwithstanding our earlier order indicating that such a motion would not be entertained during the pendency of the appeal unless the district court indicated a willingness to consider the motion for new trial prior to disposition of the pending appeal. Another panel of this court denied the renewed motion for a remand.

■ The grounds on which Lustiger asserts that he did not have effective representation of counsel at his trial are of a kind which must first be examined by the district court, since alleged facts outside of the present record are relied upon. Accordingly, we cannot deal with this contention on the record before us, but leave Lustiger to his remedy under Rule 33, Federal Rules of Criminal Procedure, pertaining to motions for a new trial.

Affirmed.