**8**

UNITED STATES of America,
Plaintiff,

v.

Charles BERG, and William Edward Barker aka Edward Barker, dba Enterprise Investments, Defendants.

No. CR 74–1411–DWW.

United States District Court,
C. D. California.

Feb. 27, 1975.

William D. Keller, U. S. Atty., Eric A. Nobles, Asst. U. S. Atty., Chief, Crim. Div., Terry W. Bird, Asst. U. S. Atty., Los Angeles, Cal., for plaintiff.

Jeremiah Casselman, Beverly Hills, Cal., for defendants.

MEMORANDUM

DAVID W. WILLIAMS, District Judge.

Defendants, Charles Berg and William Edward Barker, were partners in an Orange County firm called Enterprise Investments and they advertised themselves as "foreclosure specialists." In this two-count indictment they were charged with Conspiracy (18 U.S.C. § 371) and a violation of 12 U.S.C. § 1709–2, the so-called "equity skimming" statute. The case was tried to the Court after a proper waiver of jury and at the close of the Government's case, the conspiracy count was dismissed. The case proceeded on Count 2 which generally charged the defendants with engaging in a pattern or practice of (a) purchasing one-family dwellings which were subject to a federally insured deed of trust which was in default at the time of purchase and, (b) failing to make payments under said deed of trust as they became due and, (c) renting the property to tenants of their selection during the foreclosure period and pocketing the rental proceeds. The indictment charges that these acts were done with the intent to defraud the Governmental insuring agency and that the Federal Housing Administration (FHA) or

the Veterans Administration (VA) was actually caused large monetary losses.

Title 12, United States Code, Section 1709-2 provides:

"Whoever, with intent to defraud, willfully engages in a pattern or practice of—

(1) purchasing one- to four-family dwellings which are subject to a loan in default at time of purchase or in default within one year subsequent to the purchase and the loan is secured by a mortgage or deed of trust insured or held by the Secretary of Housing and Urban Development or guaranteed by the Veterans' Administration, or the loan is made by the Veterans' Administration,

(2) failing to make payments under the mortgage or deed of trust as the payments become due, and

(3) applying or authorizing the application of rents from such dwellings for his own use,

shall be fined not more than $5,000 or imprisoned not more than three years, or both. This section shall apply to a purchaser of such a dwelling, or a beneficial owner under any business organization of trust purchasing such dwelling, or to an officer, director, or agent of any such purchaser. Nothing in this section shall apply to the purchaser of only one such dwelling."

The defendants would follow the recordations of notices of default and would then communicate by letter or telegram with the distressed homeowner suggesting that their company might be able to assist them in their debt situation. If the homeowner responded by calling Enterprise Investors, one of the partners, usually Mr. Berg, would meet with the homeowner and offer to pay him a small sum (usually $100 to $150) in exchange for a grant deed to Enterprise to the property. In addition, the homeowner had to agree to vacate the property within a few days. Defendants would assure the homeowner that their firm could resell the property before the foreclosure was completed and that the proceeds of the resale the homeowner would get an additional amount of money, usually $600 to $700. Nothing was said to the homeowner about a plan of defendants to put tenants into possession of the property. Berg would carry a printed form of agreement with him to this first interview and after obtaining the willingness of the homeowner to accept the proposition, Berg would then produce a tape recorder and record his conversation with the homeowner. His practice was to read each paragraph of the written agreement and then ask the homeowner if he understood each provision. He further safeguarded himself by having the homeowner initial every salient provision of the agreement and then sign at the end thereof.

Once the homeowner had received the initial payment and had vacated the property, defendant Barker would advertise the house for rent and would quickly place a tenant therein at a rental that was a little less than the monthly payment due the lending agency on the trust deed. In some instances the tenant was also told that if he desired to purchase the house within the first few months of his tenancy he would get partial credit of rents he had paid against the down payment. Relying upon this, several of the tenants ill-advisedly used their own funds to improve and rehabilitate the property upon the supposition that they could later become the owner thereof.

The defendants would not record the grant deed they took from the homeowner; would not in any way contact the lending agency to advise it that they had become the deed owner of the property; would collect the rentals from the tenants they had placed in possession and keep those funds for their own use and would not make any payments to the lending agency of trust deed note installments when they became due. Eventually the lending agency would complete the foreclosure and then learn for the first time that the property was in possession of persons other than the family to whom they had made the loan. They would cause the eviction of the tenants and then

make a demand upon the federal insuring agency for the price they paid at the trust deed sale, plus foreclosure and other costs.

### I. *The WILLIAM CAVE transaction*

William Cave purchased his one-family dwelling with the assistance of a trust deed loan from Downey Savings and Loan Association insured by FHA. His payments were $203 per month. The loan first became delinquent on April 1, 1972 and he received a Notice of Default on July 3, 1972. As a result of receiving a communication from Enterprise Investments Mr. Cave met on July 7, 1972 with defendant Berg who offered him $150 for a grant deed with promises of an additional sum when the property was sold. Cave testified that he was given assurances by Berg that if there was a foreclosure it would not be in Cave's name. Cave moved from the property and without his knowledge, defendants placed Kathleen Garland in the property as a tenant at $185 per month. She lived there approximately six months and paid a total of $970 to defendants before she was compelled to move as a result of the foreclosure. Defendants paid no monthly trust deed payments as they fell due. After the trust deed sale the FHA had to pay the lender the unpaid balance of principal plus foreclosure costs and had to spend an additional $3,000 to rehabilitate the property.

### II. *The JOHN M. LOFTON transaction*

The Lofton family purchased their one-family dwelling with a loan from Bankers Mortgage Company insured by FHA upon which they were to make payments of $183 per month. Their first delinquency occurred April 1, 1972 and they had their first contact with defendants on May 31, 1972 on which date they were paid $150 for a grant deed to the property with a promise of an additional $600 upon the resale of the house. The Loftons moved from the property immediately and defendants placed tenants in possession who occupied from July to December 1972 paying rent at the rate of $195 per month or a total of $830 rentals to defendants. Defendants paid no trust deed installments to the lender. A Notice of Default was served on August 11, 1972 and the foreclosure sale was held in December of that year. Defendants made no payments on account of the trust deed during the foreclosure period and after the foreclosure sale the lender required the FHA to pay the unpaid balance of principal together with foreclosure costs. Once the government agency came into possession of the property it was required to spend over $4500 to rehabilitate it.

### III. *The JOANNE SHONTS transaction*

The Shonts family received a loan from Security Pacific National Bank, insured by VA, which obligated them to pay $204 per month. They first became delinquent on October 1, 1971 and a Notice of Default was served upon them on April 10, 1972. Their first contact with defendants was on August 23, 1972 when they agreed to deed the property to defendants for $150 and a promise of $350 additional when the property was resold. The defendants promptly placed August Caruso in the property as a tenant paying $195 per month and assured him that he could purchase the property and receive some credit of rents against the down payment if he desired to do so. Relying upon this Mr. Caruso spent approximately $500 to improve the property and paid a total of $595 in rents to the defendants but was evicted in March of 1973. Defendants made no trust deed payments as they fell due.

### IV. *The EDWARD RONJE transaction*

Mr. Ronje financed his one-family dwelling with a loan from Beverly Hills Securities Company insured by VA and he was to pay $230 per month on the loan. The loan became delinquent on October 1, 1971 and he received a Notice of Default March 9, 1972. His first contact with defendants was on March 14, 1972 when he contends that Berg

assured him that if there was a foreclosure it would not be in Ronje's name and that his VA loan would be protected. He deeded the property to Enterprise Investments for $100 and a promise of an additional $650 when the property was sold. Instead of attempting to sell the property defendant Barker placed the Robert Johnson family in as tenants at $185 per month and gave them an option to purchase and get partial credit from past rentals paid. Relying upon this, the Johnsons invested approximately $1500 in improvements to the property and paid total rents to the defendants of $975 before they were compelled to move after the foreclosure sale had taken place. Defendants paid the lender nothing during the foreclosure period. Ronje later received a letter from VA indicating his deficiency indebtness to them of over $2200.

## V. *The GARY BOYLAN transaction*

The Boylan family purchased their home with a Coast Federal loan insured by VA. Their payments were $235 monthly. A few months after the purchase in August, 1971 the couple agreed to divorce and sold their equity in the home to one Eastvedt, a real estate operator, for the sum of $100. At that time the loan was not delinquent and Eastvedt promised that he would assume the loan. On the same day, Eastvedt conveyed the property by deed to the defendants for a payment of $300. Defendants put David Peters in possession as a tenant and he occupied from November, 1972 to January, 1974 paying rent at the rate of $230 monthly to defendants. In this case the defendants did contact the lender and notified Coast Federal that they had taken the property over and they made a few payments on account of the loan but then allowed it to become delinquent. A Notice of Default was served on August 1, 1973 and the property was the subject of a foreclosure sale on December 7, 1973. During his tenancy, Peters paid a total of $3270 to defendants as rent, most of

which the defendants retained. After the foreclosure sale Mr. Boylan received a letter from VA advising that he was indebted to them by way of deficiency in the amount of over $1500.

## VI. *The ROBERT McMEN transaction*

Mr. McMen received a loan from Republic Federal Savings Company which was insured by VA in November, 1970 and he was obligated to pay $165 monthly. He became delinquent on the loan September 1, 1971 and a Notice of Default was served upon him on February 22, 1972. A few days later he had his first contact with defendants and sold them the property for $100 with a promise that he would receive $650 additional when the property was resold. He claims he was given the assurance that no foreclosure would take place in his name because the defendants would assume the unpaid balance or would resell the property. The foreclosure sale occurred September 15, 1972 and when the lender called upon the VA to respond to its insured obligations the VA paid the sums due together with foreclosure costs. The VA later called upon McMen to pay a release liability of $2117.61.

During the foreclosure period defendants placed the Joe Tafoya family in the property as tenants who paid $135 per month rent or a total of $1265 to defendants. No part of this money was paid by defendants to the lender.

Characteristic of all these transactions is the fact that the defendants did not record the deed they took from the homeowner and except for the Boylan transaction did not make any payments to the lender and make no visible effort to sell the property to any third party.

The scheme was one to parlay $100 into multiple rental collections for as long as defendants could keep the lender at bay. The running pattern of defendants' operation spells out a clear intention on their part to defraud. Each element of the offense stated in Section

1709-2 has been proved by the evidence here. Mindful of the practice of many lenders whose loans are governmentally insured to stretch out the time between the serving of the Notice of Default and the foreclosure sale (the foreclosure "cure" period) the defendants have made a business of becoming the phantom owner of the dwelling for as long as the lender sleeps on its rights and milking off the rental value of the property for a nominal outlay coupled with promises of more to come to the homeowner. The evidence convinces that there was never an effort made to sell any of these properties to a person who could assume the loan after paying an initial amount that would cure all delinquencies and pay the homeowner the amount of defendants contractually promised them upon a re-sale. With one exception there were no payments made to the lending institution and there was a conscious effort made to lull the lender into postponed fore-closure completion by not notifying them that the house had been abandoned by the mortgagor. The scheme is one to defraud if it is reasonably calculated to deceive. Gusow v. United States, 347 F.2d 755 (10th Cir. 1965); Lustiger v. United States, 386 F.2d 132, 138 (9th Cir. 1967). Here there was employed a studied plan to get the beleaguered mortgagor to abandon his equity for a mite, so the defendants could poach off the property for a few months.

The Government contends that the conduct of the defendants constituted a fraud upon the mortgagors but the evidence does not sustain this accusation. In each case the homeowner was so eager to deal with the defendants that he readily signed the written agreement tendered, and thus indicated both by signing the agreement and by their oral tape-recorded responses to Mr. Berg that they fully understood the contents there-of. However, the defendants' plan de-frauded the lending institution which might have otherwise mover faster to recover possession of the property; de-frauded the insuring governmental agency which suffered greater losses be-cause of the postponed but inevitable foreclosure sale, and lastly brought a detriment to the tenants who spent money and labor to improve the property feeling that they could eventually buy it, only to suffer summary eviction therefrom when the lender discovered their presence.

There was no intention on the part of either defendant to save the property from foreclosure by locating a financially acceptable buyer. Nor, except in a single instance, was there an intention on de-fendants' part to cure the foreclosure by making payments against the unpaid principal.

█ Intent may be inferred from the activities of the parties and thus may be proved by circumstantial evidence. U. S. v. Prince, 496 F.2d 1289, 1293 (5th Cir. 1974), Phillips v. U. S., 356 F.2d 297 (9th Cir. 1965).

It is noted that Section 1709-2 exempts from its embrace the purchaser of only one dwelling that is in the throes of fore-closure, thus making only the person who makes a business of the practice its target. Defendants testified that during the short time they were business part-ners they acquired from 50 to 75 homes generally in this manner, about half of which were government insured.

Each defendant is found Guilty of Count Two.