**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Doreen WOODS, aka Joann Barnes,
Defendant–Appellant.**

**United States of America,
Plaintiff–Appellee,**

v.

**Jason Garcia, aka Michael Bennett,
Defendant–Appellant.**

**Nos. 01–50539, 01–50618.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 12, 2003.

Filed July 14, 2003.

---

partment of Corrections. Fed. R.App. P. 43(c)(2).

Judith Rochlin, Law Offices of Judith Rochlin, Los Angeles, CA, for defendant-appellant Jason Garcia.

Debra Yang, United States Attorney; Jacqueline Chooljian, Assistant United States Attorney, Chief, Criminal Division; and Elana Shavit Artson (argued), Assistant United States Attorney, Criminal Appeals Section, Los Angeles, CA, for the plaintiff-appellee.

Before: TASHIMA, BERZON, and CLIFTON, Circuit Judges.

## OPINION

CLIFTON, Circuit Judge:

Doreen Woods and Jason Garcia were convicted of mail fraud, wire fraud, and money laundering based on their involvement in a telemarketing scheme. Woods and Garcia appeal their convictions for mail and wire fraud on the ground that the district court erroneously instructed the jury that no specific false statement was required. Woods also contends that the district court erred by taking judicial notice of a Federal Trade Commission ("FTC") telemarketing rule. Finally, Woods challenges sentencing enhancements she received for having been a manager or supervisor and for having violated a judicial order. We affirm the convictions but vacate Woods' sentence and remand for resentencing of Woods.

## I. BACKGROUND

From 1995 to 1997, Woods and Garcia participated in a telemarketing scheme at a company in Orange County, California, known initially as Magazine Network and

Kenneth M. Miller (argued), Steward & Miller, Capistrano Beach, CA, for defendant-appellant Doreen Woods.

later as Magtopia, Inc. ("MTI"). The scheme solicited over one million dollars from more than 1,900 customers, many of them elderly. An "opener" would make initial contact with potential customers, telling them that they had been selected to win one of four awards: (1) a cashier's check for $2,500, (2) a television or $3,500, (3) a designer diamond watch, or (4) a new car or $15,000. MTI bought the watches for $28 each. If asked how much the watch was worth, openers were instructed to say that they couldn't tell because "the price of diamonds varied from coast to coast." However, they were told to describe the watch in ways that made it sound valuable. For example, it was sometimes described as being like the watches given away on game shows "The Price is Right" and "Wheel of Fortune."

The openers told the customers how much money to send, purportedly representing the cost of receiving the award. The amount requested ranged from $299 to $866. The openers did not say that the money was actually for the purchase of magazines. If a customer expressed interest, the opener would pass the call to a "closer," who was described inaccurately to the customer as a "manager." The job of a closer was to convince customers to send in their checks. Closers told customers to make their checks payable to MTI, to write "magazines" on the memo line of the check, and to send the checks by overnight delivery. The closers told the customers neither the odds of winning any prize nor that MTI was selling them magazines.

After MTI received a customer's check, a closer would make a "preparation call" to the customer informing him that his check had been received and that the money he had sent was for magazines, making the award a free bonus. The closers also told the customers to expect a "verification call" from the shipping department, and instructed the customers to tell the verifiers that they understood everything. Customers were told not to ask any questions during the verification calls. During the verification calls, customers were told that the odds of receiving the car, television, or $2,500 check were each 1 in 4,000, and that everyone else would receive a watch. They were told that they were "absolutely guaranteed" to receive one of those four awards. The customers were also told that they would receive an award certificate and a form for ordering magazines.

The purpose of the verification call was to get the customer on tape as agreeing to everything. If a customer asked questions or raised objections during the verification call, the verifiers would rewind the tape and have the closer call back to "reprep" the customer in an attempt to close the deal. If a customer continued to ask questions or object during a second verification call, the verifier would erase the tape and write "verbal verification" on the order.

Woods was the corporate secretary for MTI and did such things as maintain customer files, order magazines, handle incoming checks, and verify the funds in customers' bank accounts. She also worked as an opener and as a verifier, using the name Joann Barnes. Garcia, using the name Michael Bennett, worked as a closer for MTI. Co-defendant Robert Flarida was the owner, president, and CEO of MTI. He held staff meetings, instructed salespeople on how to conduct calls, and monitored calls. He also served as a verifier and salesperson and handled customer complaints.

MTI was searched by federal agents in May 1997. Shortly thereafter, Woods and Flarida (along with Rachel Bennett[1]) set up a virtually identical operation known as North Star Publications ("North Star").

1. Bennett was charged in the original indictment and pled guilty on September 20, 1999.

Woods, using the name Marie Evans, worked as an opener, closer, and verifier for North Star. North Star solicited approximately $130,000 from more than 350 customers. It was searched by federal agents and shut down in February 1998.

At trial, seven elderly victims testified for the government. They had each sent in between $316 and $866 to MTI. They testified that they would not have sent money to MTI had they known it was for the purchase of magazines. Some of the victims had complained but to no avail. A postal inspector testified that he had determined that 68% of MTI's full-paying customers neither returned the award certificate nor received a prize, and that 48% of the full-paying customers neither returned the award certificate, received a prize, nor received a magazine. Some of the full-paying customers who did not return the award certificate or receive a prize did receive magazines selected by MTI. Seventy percent of North Star's customers did not return the award certificate; some of them received nothing while others received magazines selected by North Star. Most of the customers who did return the award certificate received the magazines they had selected.

Woods and Garcia were convicted of mail fraud under 18 U.S.C. § 1341, and of wire fraud under 18 U.S.C. § 1343. Woods was also convicted of money laundering.[2] Woods was sentenced to 87 months of imprisonment and Garcia to 41 months of imprisonment. Woods and Garcia timely appealed.

## II. DISCUSSION

### A. *Jury Instructions*

1. No Specific False Statement Was Required.

 Defendants Woods and Garcia challenge their convictions for mail and

wire fraud, contending that the court's jury instructions violated *Neder v. United States,* 527 U.S. 1, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999), by not requiring a specific false statement. We review *de novo* whether the jury instructions omitted or misstated an element of the charged offense. *United States v. Stapleton,* 293 F.3d 1111, 1114 (9th Cir.2002). We review the formulation of the instructions for abuse of discretion, considering the instructions as a whole and in context. *Id.*

 In Instructions 5 and 7, the court told the jury that, for a defendant to be convicted of mail or wire fraud, the government must prove four elements: (1) that the defendant knowingly devised or knowingly participated in a scheme or plan to defraud, or a scheme or plan for obtaining money or property by means of false or fraudulent pretenses, representations or promises; (2) that the statements made or the facts omitted as part of the scheme were material; (3) that the defendant acted with the intent to defraud; and (4) that in advancing or furthering or carrying out the scheme, the defendant used the mails/wires or caused the mails/wires to be used.

The court charged the jury in Instruction 10 that:

> In determining whether a scheme to defraud exists, you are entitled to consider not only the defendant's words and statements, but also the circumstances in which they are used as a whole.
>
> A defendant's actions can constitute a scheme to defraud even if there are no specific false statements involved. The deception need not be premised upon words or statements standing alone. The arrangement of the words or the

---

**2.** Flarida was convicted of mail fraud and money laundering.

circumstances in which they are used may create an appearance which is false or deceptive, even if the words themselves fall short of this. Thus, even if statements as part of the scheme are not literally false, you may consider whether the statements taken as a whole were misleading and deceptive. Evidence beyond a reasonable doubt that a scheme was reasonably calculated to deceive is sufficient to establish a scheme to defraud.

Defendants contend that *Neder* required the government to prove a specific material false statement on which the jury unanimously agreed. We are not persuaded.

Before *Neder*, our caselaw was clear that "[a] defendant's activities can be a scheme or artifice to defraud whether or not any specific misrepresentations are involved." *United States v. Halbert*, 640 F.2d 1000, 1007 (9th Cir.1981) (citing *United States v. Bohonus*, 628 F.2d 1167 (9th Cir.1980); *Lustiger v. United States*, 386 F.2d 132, 138 (9th Cir.1967); and *Lemon v. United States*, 278 F.2d 369, 373 (9th Cir. 1960)). In *Lustiger*, the defendant advertised property for sale with materials containing "statements, photographs and maps, unaccompanied by true statements concerning the lack of available water, [which] could reasonably have led a person of average intelligence and experience to believe that all parcels offered for sale had reasonable access to a water supply." 386 F.2d at 136. The "same pattern of fraudulent deception" was followed with respect to the availability of power and telephone lines, road access, and the surrounding community. *See id.* at 137–38. We affirmed the defendant's conviction for mail fraud, holding that, "[w]hile the statements in the advertising materials may not have been literally false, taken as a whole they were fraudulently misleading and deceptive." *Id.* at 136. We explained that "deceitful statements of half truths or the

concealment of material facts is actual fraud violative of the mail fraud statute.... [T]he deception need not be premised upon verbalized words alone. The arrangement of the words, or the circumstances in which they are used may convey the false and deceptive appearance." *Id.* at 138 (internal citations omitted).

The key lesson from *Lustiger* was that, "[i]f a scheme is devised with the intent to defraud, and the mails are used in executing the scheme, *the fact that there is no misrepresentation of a single existing fact is immaterial.* It is only necessary to prove that it is a scheme reasonably calculated to deceive, and that the mail service of the United States was used and intended to be used in the execution of the scheme." *Id.* (emphasis added). Put another way, "[t]he fraudulent nature of the 'scheme or artifice to defraud' is measured by a non-technical standard. Thus, schemes are condemned which are contrary to public policy or which fail to measure up to the reflection of moral uprightness, of fundamental honesty, fair play and right dealing in the general and business life of members of society." *Bohonus*, 628 F.2d at 1171 (internal quotation marks and citations omitted). These holdings, which squarely foreclose Defendants' argument, were in no way undermined by *Neder*.

■ The pertinent issue in *Neder* was whether materiality was an element of a "scheme or artifice to defraud" under the federal mail and wire fraud statutes. 527 U.S. at 20, 119 S.Ct. 1827. In that case, the district court did not include materiality as an element of the charged mail or wire fraud offenses in its jury instructions. *See id.* at 6, 119 S.Ct. 1827. The Eleventh Circuit affirmed, holding that materiality was not an element of the mail or wire fraud statutes. *See id.* The Supreme Court started by determining that materi-

ality was an element of fraud at common law. *See id.* at 22, 119 S.Ct. 1827. It thus "presume[d] that Congress intended to incorporate materiality unless the statute otherwise dictates." *Id.* at 23, 119 S.Ct. 1827 (internal quotation marks and citation omitted). The Court rejected the government's attempts to rebut that presumption, ruling that the government had failed to show that the language of the fraud statutes was inconsistent with a materiality requirement. *See id.* at 25, 119 S.Ct. 1827. Accordingly, the Court held that "materiality of falsehood is an element of the federal mail fraud, wire fraud, and bank fraud statutes." *Id.*

Seizing on this last quotation, Defendants argue that the government was required to prove a specific false statement on the ground that a "materiality of falsehood" requires a "falsehood." Defendants essentially contend that a "falsehood" must be either a specific false statement or a specific omission. We disagree. As noted above, *Neder* addressed the materiality of misrepresentation, not the specificity. With regard to specificity, *Neder* reiterated the holding in *Durland v. United States,* 161 U.S. 306, 16 S.Ct. 508, 40 L.Ed. 709 (1896), where the Supreme Court "construed the [mail fraud] statute to 'include[ ] everything designed to defraud by representations as to the past or present, or suggestions and promises as to the future.'" *Neder,* 527 U.S. at 24, 119 S.Ct. 1827 (quoting *Durland,* 161 U.S. at 313, 16 S.Ct. 508). The construction in *Durland,*

with which our circuit's caselaw requiring no specific misrepresentation is fully consistent, was neither overruled nor undermined in *Neder. Neder* did not address *Durland* except to reject the argument, not relevant to our purposes, that *Durland* had interpreted the mail fraud statute as encompassing more than common-law fraud. *See* 527 U.S. at 24, 119 S.Ct. 1827.

Post-*Neder* decisions confirm that *Lustiger* and its related cases remain good law. We expressly stated in a case decided after *Neder* that:

> Under the mail fraud statute the government is not required to prove any particular false statement was made. *See United States v. Halbert,* 640 F.2d 1000, 1007 (9th Cir.1981). Rather, there are alternative routes to a mail fraud conviction, one being proof of a scheme or artifice to defraud, which may or may not involve any specific false statements. *Id.; see also Lustiger v. United States,* 386 F.2d 132, 136 (9th Cir.1967).

*United States v. Munoz,* 233 F.3d 1117, 1131 (9th Cir.2000). Although *Munoz* did not mention *Neder,* its reinforcement of *Lustiger* and *Halbert* is, for the reasons stated above, not inconsistent with *Neder.* Additionally, *Lustiger* comports with the common-law meaning of fraud, which was to be incorporated into the mail and wire fraud statutes as much as possible.[3] *See United States v. Colton,* 231 F.3d 890, 898 (4th Cir.2000); *see also Neder,* 527 U.S. at 21–23, 119 S.Ct. 1827.

---

**3.** Contrary to Defendants' assertion, *United States v. Gee,* 226 F.3d 885 (7th Cir.2000), does not support a different result. In that case, the Seventh Circuit reversed the mail and wire fraud convictions of defendants who had produced and sold equipment that allowed users to descramble and view premium cable channels without permission. *See id.* at 890–91. There was no allegation or proof that the defendants had made *any* material misrepresentation or concealment. *See id.* at

891–92. That fact distinguishes *Gee* from our case. The government here alleged, for instance, that Defendants had failed to tell customers that they were soliciting money for the purchase of magazines, had omitted or falsely insinuated the odds of winning awards before soliciting money, had falsely insinuated that the awards were all of substantial value, and had falsely claimed to have awarded a $2,500 prize check. Evidence at trial supported these allegations.

■ Finally, the jury *was* instructed on the materiality requirement. It was told in Instructions 5 and 7 that an element of mail or wire fraud is that the statements made or the facts omitted as part of the scheme be material. Instruction 17 further informed the jury in pertinent part that:

All deceptive or misleading statements, false statements and half-truths, which are generally referred to as statements, and concealed, omitted and nondisclosed facts, which we collectively refer to in these instructions as the facts, must be material to form the basis of mail or wire fraud charges. The statements or a statement or omitted fact is material if it is of a kind that would reasonably influence a person to part with money or property.

Considering the instructions as a whole, we conclude that the district court did not err. Instructions 5, 7, and 17 adequately informed the jury of *Neder* 's materiality requirement. *Neder* 's requirement of a "material falsehood" did not alter our preexisting caselaw to require a specific false statement.

2. There Was No Constructive Amendment of Garcia's Indictment.

■ Garcia asserts that, by instructing the jury that no specific false statement was required even though he was charged with having made false statements, the court improperly altered the crime charged. Essentially, Garcia contends that the court constructively amended the indictment by shifting the theory of mail and wire fraud in the jury instructions from "false pretenses" to a "scheme to defraud," [4] destroying his right to be tried

only on the charges presented in the indictment. But that was not the case.

The indictment charged mail and wire fraud based on both theories:

[D]efendants ... knowingly devised, participated in, and executed a scheme to defraud elderly victims, and to obtain money and property from such victims by means of false and fraudulent pretenses, statements, representations, promises and innuendo, and the concealment and omission of material facts, in connection with the conduct of telemarketing.

As such, the court did not "broaden[ ] the possible basis for conviction" by instructing on a "scheme to defraud" theory. *United States v. Combs,* 762 F.2d 1343, 1346 (9th Cir.1985). Because the "scheme to defraud" theory was charged in the indictment, this is not a situation in which the court "substantially amended the indictment through its instructions to the jury and thus destroyed the defendant's substantial right to be tried only on charges presented in an indictment returned by a grand jury." *Id.* (internal quotation marks and citation omitted).

B. *FTC Telemarketing Sales Rule*

■ The FTC has promulgated a Telemarketing Sales Rule (the "Rule"), which in pertinent part requires telemarketers engaged in prize promotions to disclose to customers before they pay for goods or services offered (1) that no purchase or payment is required to win the prize, and (2) the odds, and any conditions, of winning the prize. 16 C.F.R. § 310.3(a)(1)(iv), (v); 16 C.F.R. § 310.4(d)(4). The district court judicially noticed the Rule over Woods' objection. We review the court's

---

**4.** Mail or wire fraud can take the form of (1) a scheme or artifice to defraud, or (2) obtaining money or property by means of false or fraudulent pretenses, representations, or promises.

*Halbert,* 640 F.2d at 1007. Each constitutes an independent and alternate basis for conviction. *United States v. Bonanno,* 852 F.2d 434, 441 (9th Cir.1988).

decision to take judicial notice for abuse of discretion. *See Madeja v. Olympic Packers, LLC,* 310 F.3d 628, 639 (9th Cir.2002).

Far from abusing its discretion, the district court complied with federal law by judicially noticing the Rule. *See* 44 U.S.C. § 1507 ("The contents of the Federal Register shall be judicially noticed . . . ."). We have previously taken judicial notice of similar regulations. *See Mora v. Vasquez (In re Mora),* 199 F.3d 1024, 1028 n. 7 (9th Cir.1999) (judicially noticing postal regulations that were incorporated into the Code of Federal Regulations).

Woods' concern that the judicial notice potentially allowed the jury to convict her on impermissible grounds set forth by the Rule (such as for failing to tell customers that she was selling magazines or that they could enter the promotion without a purchase) is without merit. The district court explained to the jury that the defendants were not on trial for violating the Rule, and that violation of the Rule would not by itself constitute mail or wire fraud. The court also instructed the jury that the defendants were not on trial for any conduct or offense not charged in the indictment.

It is true that the district court instructed the jury that a defendant's failure to inform a customer of a material fact could support conviction if the defendant had an explicit statutory obligation to disclose the fact. And it is also true that, in closing argument, the government told the jury that it could consider that the Rule imposed such a duty upon telemarketers. However, the district court's instruction and the government's closing argument correctly reflect that a scheme to defraud may be based on a nondisclosure "when there exists an independent duty that has been breached by the person so charged. This independent duty may exist in the form of a fiduciary duty to third parties, *or may derive from an independent explicit statutory duty created by legislative enactment." United States v. Dowling,* 739 F.2d 1445, 1449 (9th Cir.1984) (internal citations omitted; emphasis added), *rev'd on other grounds,* 473 U.S. 207, 105 S.Ct. 3127, 87 L.Ed.2d 152 (1985). The Rule could properly serve as the basis for such a duty. It was adopted pursuant to the Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. §§ 6101–6108, *see* 16 C.F.R. § 310.1, wherein Congress directed the FTC to prescribe telemarketing rules and requirements, *see* 15 U.S.C. § 6102(a). The duties created by the Rule were therefore "derived from an explicit and independent statutory requirement." *Dowling,* 739 F.2d at 1450.

## C. *Woods' Sentence Enhancements*

■ Woods contests two sentencing enhancements applied by the district court that had the effect of lengthening her sentence. We review the district court's factual findings at sentencing for clear error. *United States v. Collins,* 109 F.3d 1413, 1420 (9th Cir.1997). Those factual findings must be supported by a preponderance of the evidence. *Id.*

### 1. The "Manager or Supervisor" Enhancement

■ The district court increased Woods' offense level by three levels for having been a manager or supervisor at MTI. The enhancement applied if Woods "was a manager or supervisor . . . and the criminal activity involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(b) (2002). Woods must have managed or supervised one or more other participants. U.S.S.G. § 3B1.1 cmt. n. 2. "A 'participant' is a person who is criminally responsible for the commission of the offense, but need not have been convicted." U.S.S.G. § 3B1.1 cmt. n. 1. The enhancement was improper because

the record fails to show that Woods managed or supervised at least one other participant.

At sentencing, the government identified only four participants besides Woods: Flarida, Garcia, Rachel Bennett, and William Maloney.[5] The government does not contend that Woods managed or supervised Flarida. Thus, the enhancement was proper only if Woods managed or supervised Garcia, Bennett, or Maloney, all of whom were closers. But the record does not indicate that Woods managed or supervised any closer. The only activity the government identified in specific relation to closers was that Woods referred customers back to closers for reprepping. This activity was not managerial or supervisory in nature, however. It was simply part of Woods' role as a verifier.

Because all of the other participants identified (besides Flarida) were closers, and because the record fails to show that Woods managed or supervised any closer, a preponderance of the evidence does not establish that Woods managed or supervised any other participant. Application of the enhancement was thus clearly erroneous.

### 2. The Enhancement for Violation of a Judicial Order

 On October 20, 1997, a judicial injunction was entered prohibiting Flarida from selling any magazine, engaging in any prize promotion, or owning any business entity that sold a magazine or engaged in a prize promotion. It also prohibited Flarida and "his agents, employees, officers, servants, and attorneys, and those persons in active concert or participation with him, *who receive actual notice* of [the injunction] by personal service or otherwise," from making material false repre-

sentations or violating the Telemarketing Sales Rule. (Emphasis added.) In sentencing Woods, the district court applied a two-level enhancement on the ground that her offense violated the injunction. At the time of sentencing, such an enhancement was appropriate for offenses involving the "violation of any judicial ... injunction." U.S.S.G. § 2F1.1(b)(3)(B) (1997).

Woods contends that the injunction did not apply to her because she lacked actual notice of it. We agree with Woods that the record fails to demonstrate actual notice. Circumstantial evidence established that Flarida and Woods had known each other for many years and had worked together at MTI and North Star. There was also evidence that Woods had falsely claimed to have received money from NSP that had actually been paid to Flarida. Considered together, this evidence supported an inference that Woods knew that Flarida had been under investigation and possibly that Flarida was hiding something, but that does not mean that Woods was told of or knew about the court's injunction. Because a preponderance of the evidence does not establish that Woods knew of the injunction, application of the enhancement was clearly erroneous.

### III. CONCLUSION

In No. 01–50539, the judgment of conviction is affirmed, the sentence is vacated, and the case is remanded to the district court for resentencing consistent with this opinion. In No. 01–50618, the judgment of conviction is affirmed.

AFFIRMED IN PART; REVERSED AND REMANDED IN PART.

---

**5.** Maloney, a cooperating defendant, worked at MTI from the middle of 1995 until the middle of 1996.