William Merle **CANADAY**, Appellant,

v.

**UNITED STATES** of America,
Appellee.

No. 17959.

United States Court of Appeals
Eighth Circuit.

Jan. 21, 1966.

Kenneth K. Simon, Kansas City, Mo., for appellant. Robert G. Duncan, and Kenneth Cohn, Kansas City, Mo., with him on the brief.

F. Russell Millin, U. S. Atty., Kansas City, Mo., for appellee. Calvin K. Hamilton and Bruce C. Houdek, Asst. U. S. Attys., Kansas City, Mo., with him on the brief.

Before VAN OOSTERHOUT, MATTHES and MEHAFFY, Circuit Judges.

MATTHES, Circuit Judge.

William Merle Canaday was indicted, in five counts, for evasion of federal income taxes for the calendar years 1957, 1958, 1959 and 1960, in violation of 26 U.S.C. § 7201, Internal Revenue Code of 1954.[1] He was convicted by a jury on Counts III and IV (1959 and 1960) and acquitted on Counts I and II (1957 and 1958). The court, Honorable Floyd R. Gibson, suspended imposition of sentence and placed defendant on probation for a period of three years. From the judg-

ment of conviction, defendant has appealed.

The defendant advances four contentions of alleged procedural errors as grounds for a new trial, and also asserts that the evidence was insufficient to support the jury's finding of wilful intent and that the jury's verdict was inconsistent.

## SUFFICIENCY OF THE EVIDENCE

▉ Two principles of importance here are axiomatic. In resolving the question of the sufficiency of the evidence, we must consider it in the light most favorable to sustaining the verdict of the jury. National Dairy Products Corp. v. United States, 350 F.2d 321, 325 (8 Cir. 1965); Coil v. United States, 343 F.2d 573, 575 (8 Cir. 1965), and cases cited. Whether the accused, in a tax evasion prosecution, was motivated by wilful intent ordinarily presents a fact issue to be resolved by the jury. Fowler v. United States, 352 F.2d 100, 110 (8 Cir. 1965); Lessmann v. C. I. R., 327 F.2d 990, 993 (8 Cir. 1964); United States v. Vardine, 305 F.2d 60, 63 (2 Cir. 1962).

▉ Defendant's theory is that the evidence was wholly insufficient to prove that he failed to report a *"substantial part of his income and that consequently, due to this failure, the government did not meet and establish the element of willfulness."*[2] (Emphasis supplied). Defendant characterizes this prosecution as a "small peanut-type case" and, seemingly, would have us overturn the finding of the jury and the judgment of the court solely on the rationale that the unreported taxable income was not, in defendant's opinion, a substantial amount.

The word "substantial", as applicable here, is necessarily a relative term and

1. Count IV alleged that defendant filed a false and fraudulent tax return on January 27, 1961, for the year 1960 and Count V alleged that defendant filed a false and fraudulent amended return for 1960 on April 20, 1961. Upon motion of defendant, Count V was dismissed by the court prior to the trial.

2. The jury was fully instructed on all elements of the offense, including wilful intent. Additionally, the jury was required to find that "substantial amounts of income were unreported". The defendant does not, on this appeal, find fault with any portion of the court's charge.

852

not susceptible of an exact meaning. This concept is implicit in United States v. Nunan, 236 F.2d 576, at p. 585 (2 Cir. 1956), cert. denied, 353 U.S. 912, 77 S.Ct. 661, 1 L.Ed.2d 665, where the court, in pertinent part, stated:

"* * * The showing by the government must warrant a finding that the amount of the tax evaded is substantial. (Citing cases). But this is not measured in terms of gross or net income nor by any particular percentage of the tax shown to be due and payable. All the attendant circumstances must be taken into consideration. * * * But a few thousand dollars of omissions of taxable income may in a given case warrant criminal prosecution, depending on the circumstances of the particular case. Otherwise the rich and powerful could evade the income tax with impunity."

Defendant, a married man during most of the time relevant to the prosecution,[3] was a Lieutenant Colonel in the Police Department of Kansas City, Missouri, at the time the indictment was filed (March 12, 1964). Thereafter, defendant was suspended from the police force.

Defendant's records, consisting principally of cancelled checks, bank deposit slips, bank statements, mortgage documents, and similar papers, did not adequately reflect his purchases and expenditures. Therefore, the Government used the net worth-expenditures method to reconstruct and prove the amount of defendant's unreported income. Everett W. Trost, the special agent assigned the task of checking into the matter, made an intensive and exhaustive investigation of all relevant transactions of the defendant to determine: (1) whether there had been an increase in his net worth from December 31, 1955; (2) the

amount of such increase; (3) the amount of expenditures; and, (4) the correct amount of defendant's taxable income for each of the years covered by the indictment.

■ It has authoritatively been pronounced that, "[w]hen the Government rests its case solely on the approximations and circumstantial inferences of a net worth computation, the cogency of its proof depends upon its effective negation of reasonable explanations by the taxpayer inconsistent with guilt. Such refutation might fail when the Government does not track down relevant leads furnished by the taxpayer—leads reasonably susceptible of being checked, which, if true, would establish the taxpayer's innocence." Holland v. United States, 348 U.S. 121, 135–136, 75 S.Ct. 127, 135, 99 L.Ed. 150 (1954). See also, United States v. Vardine, supra, 305 F.2d at p. 63. The evidence shows that, in the course of this investigation, Agent Trost did track down *all* relevant leads furnished by the defendant which might have explained his net worth bulge and established his innocence.

A substantial part of the key evidence was submitted to the jury in the form of detailed stipulations. Thus, it was stipulated that defendant's net pay, or "take home pay", (gross salary, less all payroll deductions), as a member of the police force, was $1,686.09 in 1946, and that his salary increased until, in 1956, his net pay was $3,465.61. For the indictment years, 1957 through 1960, inclusive, defendant's net pay was $3,457.40, $4,525.30, $5,471.40, and $5,756.15, respectively; a total of $19,210.25. Included in the stipulation is a detailed summary of defendant's expenditures for the years 1956 through 1960, which shows that during those years defendant expended a total of $37,616.97 by cur-

3. Defendant married his first wife in 1942 and was divorced from her in 1946. One child was born of that marriage. He remarried his first wife in 1947, and was again divorced from her in 1953. He married his present wife in 1955, and in 1960 adopted his second wife's child by a former marriage.

rency, $12,638.52 by checks, $12,311.59 by other means; a total of $62,567.08.[4]

The results of the investigation by Agent Trost were summarized by Government exhibits introduced into evidence. These exhibits show that the net worth of defendant on December 31, 1955 (the starting point), 1956, 1957, 1958, 1959 and 1960, was: $7,995.98, $11,362.76, $14,251.81, $20,624.79, $23,900.18, $28,457.16, respectively. An increase in the net worth of defendant for each of the same years is also reflected by these exhibits. The amounts of taxable income shown by the net worth-expenditure statement as compared to the amounts of income reported by the defendant in his income tax returns, are:

| Year | Per Net Worth-Expenditure Computation | Per Return | Difference |
|---|---|---|---|
| 1956 | $ 7,476.19 | $ 2,863.77 | $ 4,612.42 |
| 1957 | 8,716.35 | 2,602.31 | 6,114.04 |
| 1958 | 9,774.33 | 4,477.49 | 5,296.84 |
| 1959 | 10,499.47 | 4,815.83 | 5,683.64 |
| 1960 | 10,302.92 | 5,290.05 | 5,012.87 |
| Total | $46,769.26 | $20,049.45 | $26,719.81 |

Thus, according to the Government's computation, the defendant reported approximately 39% of his taxable income in 1956, approximately 30% in 1957, approximately 46% in 1958, approximately 46% in 1959, and approximately 51% in 1960.

In corroboration of the net worth-expenditures statement and other Government exhibits, the Government also submitted a flow of funds schedule, reflecting all of the money received by defendant from listed sources and all of defendant's expenditures covered by the investigation. This schedule reveals the following:

| Year | Funds Received | Funds Expended | Excess of Funds Expended Over Funds Received |
|---|---|---|---|
| 1956 | $10,475.33 | $15,210.67 | $ 4,735.34 |
| 1957 | 9,342.27 | 15,113.17 | 5,770.90 |
| 1958 | 5,626.71 | 10,908.77 | 5,282.06 |
| 1959 | 10,517.50 | 16,011.70 | 5,494.20 |
| 1960 | 9,608.33 | 14,685.46 | 5,077.13 |
| Total | $45,570.14 | $71,929.77 | $26,359.63 |

Attesting to the accuracy of the net worth-expenditures statement is the difference of only $360.18 between the unreported income, as shown by that state-

4. It was stipulated that "expenditure by other means" referred to expenditures where the proceeds of loans to defendant went directly from the lender to a creditor of defendant, or where the proceeds from the sale of personal or real property went directly from the purchaser to a creditor of defendant or other recipient.

ment ($26,719.81), and the amount of expenditures in excess of funds received ($26,359.63), as shown by the flow of funds schedule.

The income omitted from defendant's income tax returns for the indictment years is reflected by a difference in his tax liability as follows:

| Year | Amount Reported | Amount Recomputed | Difference |
|---|---|---|---|
| 1957 | $ 520.46 | $ 1,866.25 | $ 1,345.79 |
| 1958 | 905.05 | 2,141.33 | 1,236.28 |
| 1959 | 979.48 | 2,329.86 | 1,350.38 |
| 1960 | 1,083.82 | 2,278.76 | 1,194.94 |
| Total | $ 3,488.81 | $ 8,616.20 | $ 5,127.39 [5] |

Defendant does not challenge the accuracy of the figures upon which the various computations are based or the validity of the results of the computations. Indeed, as previously mentioned, defendant stipulated to many of the pertinent items. Aside from proving his good reputation, defendant's principal defense was that, by 1955, he had accumulated a cash hoard, amounting to between $10,000 and $15,000, which he kept in a fireproof metal box, and that this cash was used in making many of the purchases uncovered by the investigation.

In defendant's first interview with Agent Trost, on March 7, 1961, defendant conceded that neither he, nor his wife, had ever received any inheritances, had not realized gains from sale of real estate, and had received no gifts of any consequence. Although defendant was questioned in minute detail in regard to any, and all, assets owned by him or his wife, he made no reference to the existence of a cash hoard.

In the next interview, on June 9, 1961, defendant was interrogated, under oath, by Trost and stated that, during his overseas tour of military service in World War II, he had saved $4,000, or more, in currency; that when his first divorce occurred he had accumulated $5,000, "or $5300", and that he had $10,000 on hand as of some time in 1955 and still had most of it in 1957. Defendant was unable to state the amount of cash he had on hand on December 31, 1958, 1959, or 1960, but insisted that, at the time of the interview, there remained "in the neighborhood of $1500". However, he did not grant Trost permission to view and count the cash. Later, on June 16, 1961, Trost unavailingly suggested to defendant that they go to defendant's home and count the cash in the metal box.

During another interview, on September 12, 1961, in which defendant's attorney participated,[6] defendant changed his explanation of the inception of the cash hoard and stated that he had won "$4,000, maybe $4300", in a dice game aboard ship while returning home from overseas. Defendant also informed Agent Trost during the interviews that he had added to his dice game winnings: sav-

5. The first prosecution year was 1957, prosecution for the year 1956 being barred by the Statute of Limitations. As indicated, the Government used December 31, 1955, as the starting point for its net worth-expenditures computation.

6. At all of the meetings, except the first two, between Agent Trost and defendant, a lawyer representing defendant was present. The question and answer statement taken from defendant in the second interview was examined by defendant's lawyer before defendant signed it. Additionally, Agent Trost caused a written memorandum to be made of each interview with defendant, and defendant's trial counsel were furnished with copies of them.

ings from his salary prior to September, 1954; $4,000 saved from his salary during the nine months he attended an expense-paid traffic institute at Northwestern University; and, $800 received in settlement of a lawsuit. Under pressure of cross-examination, defendant asserted that the cash hoard was supplemented from time to time by amounts derived from his gambling activities.

To show the fallaciousness of defendant's explanations regarding the alleged existence of the cash hoard, the Government offered evidence that: (1) defendant failed to mention a cash hoard in three financial statements, submitted in connection with applications for loans, in which he inflated the value of other assets; (2) during the time defendant claimed the cash hoard existed, he regularly borrowed money for purchases of automobiles, real property, furniture, awnings, an air-conditioning unit, to defray medical expenses, to meet the expense of a trip to California, and for payment of insurance premiums. (The Government introduced an exhibit showing that the defendant had procured loans, totaling over $67,000, on thirty-eight different occasions from 1946 through 1960); (3) from 1946 to 1954, during which period defendant claimed he saved money from his salary, his average annual take-home pay was $2,-369.34, although he was, for the greater part of that time, supporting a wife and child; (4) during the time (nine months) defendant attended the traffic institute, of his and his wife's $3,500 combined take-home pay, approximately $3,000 was deposited in the bank and checks had been drawn against the account in an amount almost equal to the total deposits; (5) defendant's portion of the settlement of his lawsuit was $375 instead of $1,800, the amount originally claimed in an interview with Trost, or $800, the amount claimed by defendant in a subsequent interview; and, (6) even if defendant had a cash hoard of $10,000 to $15,000 in 1955, it would have been exhausted in 1958.

Because of the varying implausible statements made by defendant, during the course of the investigation, in regard to the cash hoard, Agent Trost concluded that the hoard had never existed and, consequently, did not include the "$10,-000 to $15,000" as an asset in the net worth-expenditures statement. However, the question whether or not it did, in fact, exist was submitted to the jury by appropriate instructions.

In addition to the variety of statements made by defendant, regarding the cash hoard, all of which strain credulity, the jury could infer defendant's wilful intent to evade income taxes from these circumstances: (a) an extensive use of currency, even though defendant maintained a bank account at all relevant times; (b) a pattern of consistent underreporting of taxable income, Holland v. United States, supra; Hoyer v. United States, 223 F.2d 134 (8 Cir. 1955); Lessmann v. C. I. R., supra; Klassie v. United States, 289 F.2d 96, 101 (8 Cir. 1961); and, (c) substantial expenditures in excess of defendant's take-home pay.

Viewing all of the evidence in the light most favorable to the Government, we conclude there was a cogent factual basis for the jury's finding of wilful intent.

INCONSISTENCY OF VERDICT

We do not agree with the contention that the verdict is inconsistent. Even if we adopted defendant's hypothesis that the jury was convinced of the existence of the cash hoard in 1956, defendant's assumed corollary does not necessarily follow, as the jury could have found that the hoard would have been exhausted in 1958. Moreover, it is firmly settled that inconsistency in a verdict, on separate counts of an indictment, is not fatal and does not entitle a defendant to reversal of the judgment of conviction. In Bryson v. United States, 238 F.2d 657, 663 (9 Cir. 1956), cert. denied, 355 U.S. 817, 78 S.Ct. 20, 2 L.Ed.2d 34, upon the authority of Dunn v. United States, 284 U.S. 390, 52 S.Ct. 189, 76

L.Ed. 356 (1932), the court stated the rule in this language: "A verdict on one count of an indictment cannot have the effect of determining factual issues under another count, even though the same evidence is offered in support of both counts. The legal sufficiency of the evidence to support each verdict must be determined without reference to the other". See also, Coil v. United States, supra, 343 F.2d at p. 576; Schaefer v. United States, 265 F.2d 750, 754–755 (8 Cir. 1959), cert. denied, 361 U.S. 844, 80 S.Ct. 97, 4 L.Ed.2d 82.

## MAIL COVER

Defendant asserts that the district court erred in failing to sustain his motion to suppress evidence allegedly obtained as a result of a mail cover. His primary claims seem to be that: (1) the mail cover violated his constitutional rights; (2) Special Agent Trost was not a proper party to receive the information obtained by the mail watch; and, (3) defendant's mail was illegally "tampered with" and "delayed" as a result of the watch.

■ The challenged mail cover was neither initiated nor requested by Agent Trost. It occurred twice—from March 9, 1961, to April 7, 1961, and from June 2, 1961, to August 10, 1961. It consisted of a recordation of information contained on the outside of first-class envelopes, such as the name and address of sender and addressee.

Although defendant discusses his constitutional rights and refers to Congressional hearings on the use of "wire taps and mail covers" he cites no cases reflecting his convictions. However, the Government submits two cases which unquestionably validate the mail watch conducted in this case. United States v. Schwartz, 283 F.2d 107 (3 Cir. 1960), cert. denied, 364 U.S. 942, 81 S.Ct. 461, 5 L.Ed.2d 373; United States v. Costello, 255 F.2d 876, 881–882 (2 Cir. 1958), cert. denied, 357 U.S. 937, 78 S.Ct. 1385, 2 L.Ed.2d 1551.

■ Defendant's argument that Agent Trost was not a proper party to receive information obtained by the mail cover is, likewise, entirely without basis. The Postal Regulation upon which defendant relies was analyzed, at great length, in United States v. Schwartz, supra, and that court's interpretation was diametrically opposed to the interpretation here propounded by defendant. In fact, accepting the interpretation of the court in the Schwartz case, the regulation is not even relevant to the question of Trost's authority to receive mail cover reports. Defendant also relies upon 39 U.S.C.A. § 3523(a) (2) (K), relating to duties and responsibilities of a postal inspector, and providing that, in any criminal investigation, he shall develop evidence, locate witnesses and suspects, apprehend postal offenders, present facts to the United States Attorney, and collaborate, as required, with federal and state prosecutors in presentation before United States commissioner, grand jury and trial court. We refuse to read into this statute the requirement that a postal inspector must only give information obtained by mail covers to state and federal prosecutors and United States attorneys. Indeed, defendant cites us no authority for such an interpretation.

■ Finally, defendant's charge that his mail was "tampered with" and "delayed" is without substance. After a plenary hearing on a motion to suppress, the court found that no mail had been opened or withheld, the contents of the envelopes had not been ascertained, and the delivery of the mail had not been delayed. This finding is supported by compelling evidence. In any event, the results of the mail cover were, practically speaking, of no value, since the information obtained therefrom had, for the most part, already come to the agent's attention through other leads.

## ALLEGED INVASIONS OF PRIVACY

Defendant makes the sweeping contention that "[t]he conviction below was the result of and secured by evidence obtained by the unlawful and unreasonable invasion of [defendant's] right of privacy, amounting to an unreasonable search and

seizure and deprived [defendant] of his liberty and property without due process of the law."

Under this broad theory, defendant draws together all of his myriad complaints concerning the investigation by the Internal Revenue Service agents, primarily under five headings: (1) a renewed objection to the mail cover; (2) an objection that his privacy was violated by a wire-tap; (3) a charge that his attorney-client privilege was denied upon three occasions; (4) a claim that testimony by his ex-wife violated defendant's marital privilege; and, (5) a claim that the secrecy of defendant's grand jury testimony was violated by Special Agent Trost's contact with an assistant prosecuting attorney.

We have previously considered defendant's contention with regard to the mail cover and we deem it unnecessary to reiterate here our reasons for concluding that the mail cover did not violate any of defendant's constitutional rights.

 As is pointed out in Nardone v. United States, 308 U.S. 338, 341, 60 S.Ct. 266, 268, 84 L.Ed. 307 (1939): "The burden is, of course, on the accused in the first instance to prove to the trial court's satisfaction that wire-tapping was unlawfully employed." The short answer to defendant's illegal wire-tap contention is that there is not a shred of evidence to support his theory. Defendant's entire case in this respect is foundationed upon unsubstantiated suspicions. We cannot, in good faith, conclude that defendant even began to meet his burden of proof. Therefore, the trial court was fully justified in its determination that there was no probative wire-tap evidence in this case.

 Defendant's claim that his attorney-client privilege was violated is premised upon three separate incidents.

Only one merits discussion—the others are plainly frivolous. C. O. Smith, an attorney who prepared defendant's income tax returns, testified as a Government witness. Defendant sought to exclude his testimony by a pre-trial motion to suppress evidence. After a hearing, the district court correctly found that Mr. Smith had acted not as a lawyer, but merely as a scrivener for defendant.[7] Under these circumstances, the attorney-client relationship was not established, and any communications to Mr. Smith or documents in his custody were not subject to the privilege. Colton v. United States, 306 F.2d 633, 638, 640 (2 Cir. 1962), cert. denied, 371 U.S. 951, 83 S.Ct. 505, 9 L.Ed.2d 499; Falsone v. United States, 205 F.2d 734, 739 (5 Cir. 1953), cert. denied, 346 U.S. 864, 74 S.Ct. 103, 98 L.Ed. 375.

 Defendant's claim that the testimony given by his ex-wife violated his marital privilege has no legal basis. There was no objection to her imminent testimony when she was called to the witness stand, nor was any objection, based on marital privilege, made to any of her testimony given on direct examination. Defendant's objection to the testimony of this witness, on the ground that it violated the marital privilege, was made by a motion to strike only after defendant's counsel had failed, on cross-examination, to exploit her testimony for the benefit of defendant. Thus, even were we to assume that the testimony complained of fell within the bar of privilege, a question we need not decide, defendant effectively waived this privilege by failing to make timely objection.

 Likewise, defendant's assertion, unsupported by authority, that an unwarranted invasion of his privacy resulted from Agent Trost's contact with an

---

7. The court found that "it is patently clear that the function performed by C. O. Smith for the defendant in filling out defendant's tax returns was the function of a scrivener, and that the documents received by C. O. Smith from the defendant and the documents prepared by C. O. Smith for the defendant were not of such a nature as to be the subject of the attorney-client privilege. It is also clear that C. O. Smith voluntarily released the papers here complained of to the government agents without any coercion or duress being exercised by those agents."

assistant prosecuting attorney, is totally devoid of substance.

## ALLEGED JENCKS ACT VIOLATIONS

Defendant vigorously contends that "[t]he Trial Court prejudicially erred in refusing [defendant's] requests to inspect and use a diary kept by Special Agent Trost, the same being a statement of said witness."

The argument is advanced that: (1) the diary was producible under the "Jencks Act", 18 U.S.C.A. § 3500; (2) if not within the purview of that statute, it was, nevertheless, producible under the authority of Jencks v. United States, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957); and, (3) the error, if any, is reversible because only defendant's counsel was capable of determining what use defendant might have had for the diary.

The materials which defendant sought to inspect are four personal diaries covering each of the four years (1961, 1962, 1963 and 1964) subsequent to the commencement of the investigation.[8] Upon defendant's motion to produce, the court made an in camera inspection of the 1961 and 1962 diaries and further questioned Special Agent Trost.

The Court then concluded:

"The [diary] has not been used by the witness to refresh his recollection, it being a personal diary, which is merely a log of his investigation of this case and other cases that were submitted to him, and details the persons he contacted at various times, and does not contain any statement of what any witness or any person contacted said. It does refer to memos taken from witnesses, but the contents in no way are disclosed in the diary, or the effect of the statements, or any statements set out in haec verba, or

any literal translation of the statements of any witnesses.

"It would appear to the Court that this is not in fact a memo made by a witness to a government agent that would require production under Section 3500. It also appears to be not even a work product of the witness, in view of the fact that the same is not submitted to any government agent or to any other person. * * * On that basis, the diaries are ruled not to be subject to inspection under Rule 3500, for the purpose of this case."

Whether a statement falls within the scope of 18 U.S.C.A. § 3500 is ordinarily a question of fact to be determined by the trial court and that court's determination should not be disturbed on appeal unless it is clearly erroneous. Campbell v. United States, 373 U.S. 487, 83 S.Ct. 1356, 10 L.Ed.2d 501 (1963); Palermo v. United States, 360 U.S. 343, 353–355, 79 S.Ct. 1217, 3 L.Ed. 2d 1287 (1959); Hayes v. United States, 329 F.2d 209, 220 (8 Cir. 1964). Pursuant to the court's direction, the diaries were impounded and submitted to this court. Having received and carefully searched through *all* of them, we are in complete agreement with the trial court's ruling. As was aptly observed by Judge Gibson, the diaries contain merely Agent Trost's personal *listing* of names of persons interviewed each day concerning several cases on which the agent worked during the four year period. They might best be described as informal daily logs and disclose nothing which could have possibly aided defendant. It is noteworthy that Trost did not make any reference to the diaries while he was on the witness stand, nor were the diaries ever furnished to any Government agent or agency. By no stretch of the imagination could we find that the diaries fall

---

8. Counsel for defendant was furnished, under § 3500, with Agent Trost's 111 page report, including a list of 365 Government exhibits, and 106 Government witnesses, with a summary of each witness' expected testimony. Six memoranda of conferences with defendant and his counsel were also furnished. Additionally, Agent Trost supplied defendant with a copy of his report on supplemental investigation.

within the purport and compass of § 3500.

 Neither are they producible under the authority of Jencks v. United States, supra. Contrary to defendant's contention, the Supreme Court clearly held in Palermo v. United States, supra, that the purpose of the Act, its fair reading, and its overwhelming legislative history reflect an intent that 18 U.S.C.A. § 3500 be the exclusive guide for producibility rather than a mere addendum to the *Jencks* case.

The defendant's final allegation is that the trial court prejudicially erred in refusing defendant's request that the court inspect, in camera, a criminal action memorandum to determine its producibility under 18 U.S.C.A. § 3500.

The evidence reveals, and the defendant concedes, that this memorandum was a product of the office of the regional counsel in Omaha, Nebraska. Agent Trost did not prepare or sign the memorandum, neither was he interrogated in connection with its preparation. To be sure, there was included in the memorandum information obtained from documents furnished by Trost. However, it is manifest from the undisputed testimony of Trost, that a copy of each document furnished the office of the regional counsel was timely given to counsel for defendant.

Because the defendant may not, and cannot, know whether a statement is producible within the contemplation of § 3500, the district court must conduct any inquiry which is "necessary to aid the judge to discharge the responsibility laid upon him to enforce the statute." Campbell v. United States, 365 U.S. 85, 95, 81 S.Ct. 421, 427, 5 L.Ed.2d 428 (1961). Such an inquiry may involve interrogation of the Government agent, or an in camera examination of what is purported to be a "statement" under the statute. Saunders v. United States, 114 U.S.App.D.C. 345, 316 F.2d 346, 349 (1963); Hilliard v. United States, 115 U.S.App.D.C. 86, 317 F.2d 150, 151 (1963). The record shows that

Judge Gibson fully discharged the duty thus imposed upon him. Agent Trost was questioned, at length, in regard to the criminal memorandum by both counsel and the judge. The examination satisfied the judge and satisfies us that the memorandum does not fall within the ambit of the statute. In this situation, an in camera inspection was not required. Clearly no prejudice resulted.

The defendant received a fair trial. He was found guilty on substantial evidence, and the judgment must be, and is,

Affirmed.