**UNITED STATES of America, Plaintiff,**

v.

**Dennis Roy CHOATE, Defendant.**

**No. CR 74–1250–F.**

United States District Court,
C. D. California.

Nov. 16, 1976.

William D. Keller, U.S. Atty., Eric A. Nobles, Asst. U.S. Atty., Chief, Crim. Div., Joel Levine, Asst. U.S. Atty., Los Angeles, Cal., for plaintiff.

Richard G. Sherman, Los Angeles, Cal., for defendant.

## MEMORANDUM OPINION

FERGUSON, District Judge.

This matter is before the court on defendant's motion to suppress all evidence sought to be introduced against him in a prosecution for attempted tax evasion under 26 U.S.C. § 7201. His argument initially centered on the activities of one Carl Thompson, a government informant who, Choate contended, had obtained substantial information through an illegal search of his residence. That information, it was alleged, provided the impetus for the entire income tax investigation that culminated in Choate's indictment and prosecution. During the course of an evidentiary hearing on defendant's motion which was held on July 13, 1976, it also became clear that the government had, as part of its investigation, requested a mail cover on Choate which ran from July 31, 1972 to August 25, 1972. The legality of such a procedure in the absence of a search warrant became the second point at issue.

The court has determined that as to the first of these grounds, the activities of Carl Thompson, the government has sustained its burden of establishing by a preponderance of the evidence that the primary illegality did not taint the evidence in this case in more than a de minimis manner. Nevertheless, the mail cover procedure both failed to comply with relevant postal regulations and constituted an unconstitutional violation of Choate's Fourth Amendment rights. Since the taint resulting from this illegality permeated the whole of the ensuing investigation and development of evidence, defendant's motion to suppress must be granted.

1. *Compliance with postal regulations.*

Regulations governing the use of mail covers [1] are set forth in 39 C.F.R. § 233.2. These provisions were first promulgated on June 17, 1965; they were republished without substantial change in March 1975.[2]

---

1. "Mail cover" is defined as follows:

    (1) "Mail cover" is the process by which a record is made of any data appearing on the outside cover of any class of mail matter, including checking the contents of any second-, third-, or fourth-class mail matter as now sanctioned by law, in order to obtain information in the interest of (i) protecting the national security, (ii) locating a fugitive, or (iii) obtaining evidence of commission or attempted commission of a crime.
    39 C.F.R. § 233.2(c)(1) (1975).

2. See 40 Fed.Reg. 11579 (March 12, 1975). Earlier codifications of the official procedure regarding mail covers were much less detailed. Prior to revision in 1954, the following regulations applied:

    (a) . . . Postmasters may give to officers of the law, upon proper identification to aid in the apprehension of fugitives from justice, information regarding the addresses, return cards, or postmarks on mail matter, but shall not withhold such mail from the addressees or delay its delivery.

(b) Upon official request of a representative of another executive department, agency, or independent establishment of the Federal Government and the presentation of proper credentials, postmasters may, when practicable, furnish for official use information regarding the addresses, return cards, or postmarks on mail matter. . . .
39 C.F.R. § 41.4(b) (1949).
As modified, they were included in the postal manual in the following form:

    311.6. Mail Matter. Furnish information concerning mail or mailing permits to postal inspectors and to the sender, the addressee or the authorized representative of either on proper identification. Do not give such information to others. . . .

    311.7. Concerning Fugitives. Furnish to officers of the law, on proper identification, information regarding the addresses, return addresses, or postmarks on mail to aid in the apprehension of fugitives from justice.

    .    .    .    .    .

    831.44. Mail Cover. Requests by postal inspectors in charge and postal inspectors for

They constitute the "sole authority and procedure" for initiating, processing, placing and using mail covers. 39 C.F.R. § 233.2(b) (1975).

■ Mail covers may be authorized either as part of an investigation of violations of postal statutes or under certain limited circumstances when necessary to assist law enforcement agencies in criminal investigations. The regulations, in relevant part, state that

> (e)(1) All Postal Inspectors in Charge, and not more than three designees pursuant to delegations in writing, may order mail covers within their districts under the following circumstances:
>
> .    .    .    .    .
>
> (ii) Where written request is received from any law enforcement agency of

information regarding the addresses, return addresses, or postmarks on mail must be treated in strict confidence and complied with carefully and accurately. In obtaining the information, do not delay delivery of the mail.

Reprinted in *Hearings Before the Subcommittee on Administrative Practice and Procedure of the Senate Committee on the Judiciary, Invasions of Privacy (Government Agencies)*, 89th Cong., 1st Sess., pt. 1, 339 (1965) (hereinafter cited as "*Hearings*").

Case law discussing the interpretation of mail cover regulations is limited to a consideration of these earlier regulations, not those currently in force. *See United States v. Schwartz*, 283 F.2d 107 (3d Cir. 1960), *cert. denied*, 364 U.S. 942, 81 S.Ct. 461, 5 L.Ed.2d 373 (1961); *United States v. Costello*, 255 F.2d 876 (2d Cir.), *cert. denied*, 357 U.S. 937, 78 S.Ct. 1385, 2 L.Ed.2d 1551 (1958). *Canaday v. United States*, 354 F.2d 849 (8th Cir. 1966), although decided after the new regulations had been adopted, dealt with mail covers authorized in 1961. *See generally* Note, "Invasion of Privacy: Use and Abuse of Mail Covers," 4 *Colum. J. of Law & Soc. Probs.* 165 (1968) (hereinafter referred to as "Note, 'Invasion of Privacy'").

3. 39 C.F.R. § 233.2(e)(1)(ii) (1975) (emphasis added). A parallel provision gives the Chief Postal Inspector the added authority to order mail covers when necessary to protect the national security:

> (2) The Chief Postal Inspector, or his designee, may order mail covers under the following circumstances:
> (i) When he has reason to believe the subject or subjects of the mail cover are engaged in any activity violative of any postal statute.

the Federal, State, or local governments, wherein the requesting authority *stipulates and specifies the reasonable grounds that exist* which demonstrate the mail cover would aid in the location of a fugitive, or that it would assist in obtaining information concerning the commission or attempted commission of a crime.[3]

■ In requesting a mail cover on Choate, a fairly simple procedure was followed. A letter dated July 19, 1972, was prepared, apparently by Agent Lynn Williams,[4] and signed by Melvin C. Johnson, Special Agent in Charge. It was addressed to Stanley H. Johnson, Postal Inspector in Charge, Los Angeles, and requested a 30-day mail cover on first and fourth class mail delivered to one of three addresses.[5]

> (ii) When written request is received from any law enforcement agency wherein the requesting authority stipulates and specifies the reasonable grounds that exist which demonstrate the mail cover is necessary to (A) protect the national security, (B) locate a fugitive, or (C) obtain information regarding the commission or attempted commission of a crime.
> 39 C.F.R. § 233.2(d)(2) (1975).

4. Agent Williams was at that time working as part of a hard narcotics unit of the U.S. Bureau of Customs; by the time of the hearing on the motion to suppress, he had become a special agent of the Drug Enforcement Administration.

5. The letter read as follows:

July 19, 1972
LA06RO692701

Mr. Stanley H. Jenson
Postal Inspector in Charge
P.O. Box 30456
Los Angeles, California

Dear Sir:

A cover for First and Fourth Class mail is requested for the following names and addresses:

> Dennis Roy CHOATE
> 511 W. Bay St., Apt. A
> Balboa, California
>
> CARSON AND CHOATE SURFBOARDERS
> 2811 Newport Blvd.
> Newport Beach, California
>
> Dennis Roy CHOATE
> P.O. Box 886
> Balboa, California

The above listed subject is currently under investigation by this office for the suspected

Key language purported to supply the "reasonable grounds that exist which demonstrate the mail cover . . . would assist in obtaining information concerning the commission or attempted commission of a crime": "The above listed subject is currently under investigation by this office for the suspected smuggling of large quantities of narcotics into the United States. CHOATE is currently organizing a large narcotic smuggling ring with the primary source located in South America. *It is felt that CHOATE and the source in South America correspond by mail*" (emphasis added). It is clear from the congressional hearings which provided the impetus for their adoption and from an examination of the regulations as a whole that this was not a sufficient specification to sustain the Postal Inspector in Charge's order.

Hearings on the invasion of privacy by government agencies were begun in February of 1965 before the Subcommittee on Administrative Practice and Procedure of the Senate Committee on the Judiciary, apparently as a result of disclosures that a mail cover had been authorized on a New York attorney, Roy Cohn, and his lawyer while Cohn was under indictment for perjury and conspiracy. *See* Note, "Invasion of Privacy," *supra*, at 170. A dialogue between Committee counsel Mr. Fensterwald and Mr. H. B. Montague, Chief Postal Inspector, Post Office Department, during the course of the hearings indicates that the Post Office Department as of February 23, 1965 was on notice of congressional concern with indiscriminate use of mail covers:

Mr. FENSTERWALD. What sort of checking is done to insure that the requesting agency has a bona fide reason for instituting a mail cover?

Mr. MONTAGUE. We know the agencies with whom we deal on a day-to-day basis, and they request a mail cover in writing, and they certify that it is in connection with one of their investigations. They specify it is in connection with a violation of the law.

Mr. FENSTERWALD. How do you make sure that the agency is not just on a fishing expedition?

Mr. MONTAGUE. There has to be some trust and mutual understanding among enforcement agencies or you would never get your work done. We have confidence in these other agencies. Up to now I have had no reason to question or distrust any of them.

Mr. FENSTERWALD. It is your feeling no enforcement agency in this country ever goes on a fishing expedition?

Mr. MONTAGUE. I think any law enforcement agency, when they make an investigation, has a good reason for doing it and that there is some suspicion a crime has been committed. They don't

---

smuggling of large quantities of narcotics into the United States. CHOATE is currently organizing a large narcotic smuggling ring with the primary source located in South America. It is felt that CHOATE and the source in South America correspond by mail. Return addresses on mail received at the above addresses would be of aid in identifying the source in South America and other members of the smuggling ring. It is requested that a mail cover be placed at the above addresses for a period of 30 days. *It is further requested that all replies be directed to Special Agent Lynn P. Williams.*

Smuggling narcotics into the United States is in violation of Title 21 USC 952 and carries a penalty under Title 21 USC 960(a)(1) of 15 years imprisonment or a fine of $25,000 and/or both. CHOATE is not under indict-

ment as a result of any investigation conducted by this office nor does this office have any knowledge of any other indictments pending against CHOATE. It is believed that CHOATE has retained Sherman & Sturman, Attorneys at Law, 8500 Wilshire Blvd., Suite 908, Beverly Hills, California as legal counsel. Your cooperation in this matter would be appreciated.

Sincerely yours,

MELVIN C. JOHNSON
Special Agent in Charge

cc: SIU 5

WILLIAMS/ab

**266**

just go out without having some idea that a violation has been committed.

Mr. FENSTERWALD. You don't look behind the piece of paper in any case to see whether there is a reasonable cause for putting a mail cover on it?

Mr. MONTAGUE. Normally we don't.

Mr. FENSTERWALD. If there were any abuses in the use of mail covers, how would you know of them?

Mr. MONTAGUE. If they were flagrant abuses we would receive complaints of some kind concerning them. But all of these other agencies in the law enforcement work, I believe, are dedicated to the same principles we are. They take the same oath of office that we take, and we have found no reason to not have confidence and trust in them, and we do.

Mr. FENSTERWALD. If there were abuses how would you know of them?

Mr. MONTAGUE. We would probably get complaints. Any time there are abuses you receive complaints.

Mr. FENSTERWALD. Mr. Montague, who is going to complain? We have just heard that you never take this into court. You use it merely as a lead. It is only when you have a goof does anybody ever hear of a mail cover. So where are these complaints going to come from?

Mr. MONTAGUE. You are implying, Mr. Fensterwald, that these are put in indiscriminately, whether they are going to serve any purpose or not and whether or not they do serve any purpose. That isn't so.

Law enforcement agencies just don't have the time to do that. They have little enough help to get the work done and they will not do it unnecessarily.

Mr. FENSTERWALD. I was not implying that. I was merely implying that you have no way of knowing whether there were abuses or not.

Mr. MONTAGUE. I am quite confident if there were abuses we would hear about it and we would know about it. *Hearings, supra,* pt. 1, at 88–89.

New, more detailed postal regulations were promulgated on July 17, 1965. The key language "specifies the reasonable grounds that exist" had not appeared in previous versions of the regulations. It can only be concluded that it was introduced in response to congressional pressure (particularly since Senator Edward Long, Chairman of the Senate Subcommittee, had introduced a bill that would have barred all use of mail covers but did not press the measure in light of the revision in the regulations). *See* Note, "Invasion of Privacy," *supra,* at 173–74. It must also be observed that the whole thrust of the 1965 revision was to provide a more elaborate set of requirements for invocation of mail covers. Strict requirements that requests be in writing were introduced [6] and the individuals authorized to approve such measures were sharply limited.[7] To allow any law enforcement agency to obtain a mail cover without specification of any tangible justification would clearly run counter to the intent of the revision or at least the congressional action which led to its promulgation. The provision should, therefore, be read as having some substantial significance—if an agency's mere "feeling" that criminal activity is afoot is sufficient to provide the needed showing, it will have been read out of existence. This court must therefore conclude that since no "reasonable ground that exists" was specified,

**6.**     (3) Where time is of the essence, the Postal Inspector in Charge, or his designee, may act upon an oral request to be confirmed by the requesting authority in writing within 2 business days. However, no information shall be released until an appropriate written order is received.

39 C.F.R. § 233.2(e)(3) (1975). *See also* § 233.2(d)(2)(iii), the parallel provision governing the Chief Postal Inspector.

**7.**     (3) No officer or employee of the Postal Service other than the Chief Postal Inspector, or Postal Inspectors in Charge, and their designees, are authorized to order mail covers. Under no circumstances shall a postmaster or postal employee furnish information as defined in § 233.2(c) to any person except as authorized by the Chief Postal Inspector, a Postal Inspector in Charge, or their designees.

39 C.F.R. § 233.2(f)(3) (1975).

the mail cover on Choate was not legally authorized.

### 2. *Constitutionality of the mail cover.*

Suppression of evidence that resulted from leads developed as a result of the mail cover is also constitutionally dictated. Although the government has cited a well-recognized line of cases which in the past upheld mail covers against constitutional challenge, the "reasonable expectation of privacy" test of *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), mandates a contrary decision in the case at bar. While a number of pre-*Katz* courts upheld mail covers against a variety of challenges, only *Lustiger v. United States,* 386 F.2d 132 (9th Cir. 1967), *cert. denied,* 390 U.S. 951, 88 S.Ct. 1042, 19 L.Ed.2d 1142 (1968), specifically addressed the Fourth Amendment question.[8] While the Ninth Circuit spoke in broad terms in *Lustiger,*[9] it did so without the aid of the Supreme Court's opinion in *Katz,* which came down one month later.

Post-*Katz* authority is limited. The court in *United States v. Isaacs,* 347 F.Supp. 743 (N.D.Ill.1972), upheld use of a mail cover with little discussion: it merely cited the pre-*Katz* line of cases and stated that its reading of *Katz* gave it no reason to find mail cover operations unconstitutional. *United States v. Balistrieri,* 403 F.2d 472 (7th Cir. 1968), upheld a mail cover but without explicitly discussing its reasoning or even mentioning *Katz,* perhaps because the mail cover in question had occurred in 1961.

*United States v. Leonard,* 524 F.2d 1076, 1086–87 (2d Cir. 1975), also upheld use of a mail cover, but did so under peculiar circumstances which can be distinguished. The defendant was charged with violation of the tax laws under 26 U.S.C. § 7206(1). The government had used the mail cover in question to acquire xerox copies of the faces of envelopes without return addresses mailed from Switzerland to New York in order to match postage meter numbers and determine whether the defendant in denying in an affidavit any dealings with foreign banks had perjured himself so as to show that his failure to include certain payments as part of his income had been wilful. The court, in upholding the mail cover operations, discussed a variety of grounds for its decision: it cited the enactment of the Bank Secrecy Act shortly after these mail covers had taken place, characterized the search as a reasonable one under the circumstances, and remarked that "it is difficult to see how there can be any such reasonable expectation [of privacy] with respect to the outsides of incoming international mails which are subject to inspection and even in some cases to opening in aid of the enforcement of the customs laws."[10]

---

**8.** *Cohen v. United States,* 378 F.2d 751, 760 (9th Cir.), *cert. denied,* 389 U.S. 897, 88 S.Ct. 217, 19 L.Ed.2d 215 (1967), also upheld a mail cover, but rested this holding explicitly on compliance with the provisions of 18 U.S.C. §§ 1701–1703 as interpreted by earlier courts and rejection of defendant's First Amendment claims. The other pre-*Katz* mail cover cases, *Canaday v. United States, supra,* 354 F.2d at 856, *United States v. Costello, supra,* 255 F.2d 876, and *United States v. Schwartz, supra,* 283 F.2d 107, do not address the constitutional question but rather limit their discussion to the relevant statutes and postal regulations. Note, "Invasion of Privacy," *supra,* while apparently in press at the time *Katz* was decided, contains a helpful discussion of the relevant cases.

**9.** "[T]he Fourth Amendment does not preclude postal inspectors from copying information contained on the outside of sealed envelopes in the mail, where no substantial delay in the

delivery of the mail is involved. See *Canaday v. United States,* 8 Cir., 354 F.2d 849, 856." 386 F.2d at 139.

**10.** Customs officials have undertaken warrantless searches and seizures of envelopes entering the United States upon suspicion that they contain contraband, including illicit drugs, seditious or obscene material, pursuant to 19 U.S.C. § 482, 19 C.F.R. Part 145 and 39 C.F.R. Part 61. Such actions have in the past been upheld on a border search rationale. See *United States v. Barclift,* 514 F.2d 1073 (9th Cir. 1975), *cert. denied,* 423 U.S. 842, 96 S.Ct. 76, 46 L.Ed.2d 63 (1975), *United States v. Odland,* 502 F.2d 148 (7th Cir. 1974), *cert. denied,* 419 U.S. 1088, 95 S.Ct. 679, 42 L.Ed.2d 680 (1974). *But see United States v. Ramsey,* 538 F.2d 415 (D.C.Cir. 1976). The Supreme Court has recently agreed to review the *Ramsey* decision. *See* —— U.S. ——, 97 S.Ct. 56, 50 L.Ed.2d 75 (1976).

*Id.* at 1087. That its holding was not intended to' validate all mail covers under all circumstances was also clear from the following statement: "It may well be that, in these days of increased concern for the protection of privacy, the statement in *Costello* [*United States v. Costello,* 255 F.2d 876 (2 Cir. 1958)] should not be read as an absolute, permitting, for example, the Government to copy the outside of every envelope received by every citizen." *Id.*

■ *Leonard* thus invites a reexamination of the constitutional underpinnings of mail covers. Nor is *Lustiger,* which was decided before *Katz,* necessarily adverse. Quite apart from the implications of *Katz, Lustiger* can be confined to circumstances not present in the instant case: there, the mail cover was limited to a particular post office box where all mail received was related to a scheme already under investigation; [11] here, a general search of *all* envelopes was undertaken.[12]

■ In the final analysis, however, the real problem is not merely to distinguish

cases, but to apply *Katz* to the instant situation. *Katz* is most often cited for its abandonment of property-based Fourth Amendment analysis and its adoption of a new rule: "the Fourth Amendment protects people, not places." 389 U.S. at 351, 88 S.Ct. at 511, 19 L.Ed.2d 581. Clearly, then, the fact that a letter is sealed inside an envelope while a return address appears on the outside of that envelope is not dispositive, for physical location in and of itself is no longer the controlling parameter.

Another possible formulation of the issue may be equally misleading: is the *fact* that a communication took place as distinguished from what was said in that communication protected by the Fourth Amendment? To so frame the question oversimplifies matters, however, for it is the identity of the sender, not merely the fact that a letter was received, that was of interest to the law enforcement authorities in this case.[13] The use of italics does not except this situation from normal Fourth Amendment analysis.[14]

It should be noted that the activities in the instant case were not controlled by this line of authority. Although in his request for a mail cover, the agent mentioned foreign mail, only domestic mail was actually received during the relevant period. No envelopes were opened or contents actually seized.

11. The defendant was being investigated for mail fraud in connection with his development of a subdivision called "Lake Mead City"; the mail cover at issue involved only the recordation of return addresses on mail received in a Phoenix, Arizona post office box in the name of "Lake Mead City," all of which, apparently, came from his "customers," those who were responding to his sales pitch in connection with the development scheme.

12. The crucial piece of evidence acquired under the mail cover and at issue here was the name of a bank in which Choate had an account. It is noteworthy that this information was not at all within the scope of the initial justification— tracing a narcotics source through communications with him directed to South America. General searches are regarded as inherently unreasonable and are particularly offensive to the Constitution. *See Marron v. United States,* 275 U.S. 192, 48 S.Ct. 94, 72 L.Ed. 231 (1927).

13. *Ex parte Jackson,* 96 U.S. 727, 733, 24 L.Ed. 877 (1878) has no contrary implications. There the Court upheld an act of Congress making it

illegal to transport circulars concerning lotteries and a variety of other "indecent" materials through the mails. It was careful to state, however, that

> Letters and sealed packages [subject to letter postage] in the mail are as fully guarded from examination and inspection, except as to their outward form and weight, as if they were retained by the parties forwarding them in their own domiciles. The constitutional guaranty of the right of the people to be secure in their papers against unreasonable searches and seizures extends to their papers, thus closed against inspection, wherever they may be. Whilst in the mail, they can only be opened and examined under like warrant, issued upon similar oath or affirmation, particularly describing the thing to be seized, as is required when papers are subject to search in one's own household.

The precise meaning of "outward appearance" is unclear: the phrase seems to connote such physical attributes as shape, length and breadth. To suggest that this limited language is somehow binding law and that it encompasses return addresses would be to give inappropriate emphasis to a general statement that is essentially dicta.

14. The Ninth Circuit, in considering the Fourth Amendment protections applicable to the plac-

The *Katz* touchstone—the "reasonable expectation of privacy"—must then be brought to bear.[15] The almost paradoxical complexity of this seemingly simple standard has been recognized from the date of its promulgation: "[w]hat a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection (citations omitted) [b]ut what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected (citations omitted)." 389 U.S. at 351–52, 88 S.Ct. at 511, 19 L.Ed.2d 581–582.

■ Such an expectation of privacy is not monolithic. The "reasonableness" in question has more than one dimension. On one level, it takes into account tangible, physical circumstances and the possibility of intrusion. *See United States v. Kim,* 415 F.Supp. 1252 (D.Hawaii 1976) (defendant who was observed through open curtains by FBI agents using 800 mm telescope with 60 mm opening had not renounced his expectation of privacy and opened his person, house and papers to telescopic scrutiny); *People v. Sneed,* 32 Cal.App.3d 535, 108 Cal.Rptr. 146 (1973) (while defendant could have anticipated observation by his neighbors or by airplanes flying at legal and reasonable heights, he maintained a reasonable expectation of privacy as to what was in his back yard with respect to a helicopter flying at a height of 20 or 25 feet). On another level, however, it is shaped by the more intangible purpose and nature of a potential intrusion.[16] *See Kroehler v. Scott,* 391 F.Supp. 1114 (E.D.Pa.1975) (expectation of privacy exists with respect to activity in stalls of public toilets whether or not doors are provided); *People v. Triggs,* 8 Cal.3d 884, 106 Cal.Rptr. 408, 506 P.2d 232 (1973) (use of doorless toilet stall is not a renunciation of expectation of privacy with respect to police observation).[17]

ing of phone calls (as opposed to the content of telephonic communications), has recognized as much. See note 19, *infra.*

15. The interest in privacy referred to in *Katz* is not a "general constitutional 'right to privacy.'" 389 U.S. at 350, 88 S.Ct. 507, 19 L.Ed.2d 581. Rather, *Katz* gave new prominence to the specific "penumbra" formed by the "emanations" of the Fourth Amendment described in *Griswold v. Connecticut,* 381 U.S. 479, 484–85, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), as existing even in the early "privacies of life" language of *Boyd v. United States,* 116 U.S. 616, 630, 6 S.Ct. 524, 29 L.Ed. 746 (1886). While the Fourth Amendment interest in privacy is most prominent in this case, the implications of mail covers for the evolving First and Ninth Amendment interests in privacy of association recognized in *Griswold* cannot be lightly dismissed.

16. Analogy might also be made to the situation in which trash is placed in a receptacle for disposal. In such circumstances, an individual arguably continues to expect some measure of privacy, *i. e.,* he realizes that trash collectors will handle and dispose of his refuse, but reasonably expects no one else to do so. Several cases have utilized such analysis, although phrasing the issue in terms of limited abandonment of the property rather than limited expectations of privacy. *See People v. Krivda,* 5 Cal.3d 357, 366, 96 Cal.Rptr. 62, 486 P.2d 1262 (1971), *vacated,* 409 U.S. 33, 92 S.Ct. 32, 34 L.Ed.2d 45 (1972), *opinion reinstated on remand,* 8 Cal.3d 623, 105 Cal.Rptr. 521, 504 P.2d

457 (1973); *People v. Edwards,* 71 Cal.2d 1096, 1104, 80 Cal.Rptr. 633, 458 P.2d 713 (1969); *Work v. United States,* 100 U.S.App.D.C. 237, 243 F.2d 660, 662–63 (1957); *United States v. Kahan,* 350 F.Supp. 784, 795–98 (S.D.N.Y. 1972), *modified on other grounds,* 479 F.2d 290 (2d Cir. 1973), *rev.,* 415 U.S. 239, 94 S.Ct. 1179, 39 L.Ed.2d 297 (1974).

Although several federal courts have upheld warrantless searches of refuse (see *Magda v. Benson,* 536 F.2d 111 (6th Cir. 1976); *United States v. Mustone,* 469 F.2d 970, 972 (1st Cir. 1972); *United States v. Dzialak,* 441 F.2d 212, 215 (2d Cir.), *cert. denied,* 404 U.S. 883, 92 S.Ct. 218, 30 L.Ed.2d 165 (1971); *United States v. Stroble,* 431 F.2d 1273, 1276 (6th Cir. 1970) ), they have done so on the theory that any interest in the trash was abandoned. Such a determination that the necessary subjective expectation of privacy was lacking does not address the question of whether a limited objective expectation of privacy might in principle exist. It has not been contended, nor could it be, that mail in the course of transit is "abandoned" property.

17. *See also People v. Sneed, supra,* 32 Cal. App.3d at 541, 108 Cal.Rptr. at 150 ("though a person may have consented to observations from some sources and by some persons and therefore cannot have a reasonable expectation of privacy as to those sources or persons, he does not thereby forego his Fourth Amendment protection as to intrusions from all sources and by all persons, and particularly has not waived his right to privacy as to government agents.")

■ It cannot be denied that a reasonable person's expectation of privacy with regard to return addresses on mail is a somewhat limited one. He understands that this information is necessary to postal operations and will be examined and utilized in order to route items when the name and address of the addressee is incorrect, absent, or illegible.[18] But the disclosure mandated by these circumstances is not broad or for all purposes: a reasonable person still expects (1) that the information contained in the return address will only be used for postal purposes, and (2) that it will be utilized in only a mechanical fashion without any records being kept. The recording and disclosure to non-postal authorities for non-postal purposes that results from a mail cover extends far beyond these narrow bounds.

■ No extraordinary governmental interest is raised to justify the resulting incursion into the realm of privacy delimited by such reasonable expectations. No claim is made that mail covers further the business of the Postal Service. The sole interest of the Postal Service in undertaking this form of surveillance with regard to the defendant was to assist governmental agencies in snooping. The only stated basis for the warrantless intrusion was a "feeling," in the acknowledged absence of probable cause, that a crime was being committed. The dangers of administratively ordered searches in the absence of judicial warrant have long been recognized. As the Supreme Court stressed in *United States v. United States District Court,* 407 U.S. 297, 316–17, 92 S.Ct. 2125, 2136–37, 32 L.Ed.2d 752 (1972):

. . . Fourth Amendment freedoms cannot properly be guaranteed if . . . surveillances may be conducted solely within the discretion of the Executive Branch. The Fourth Amendment does not contemplate the executive officers of Government as neutral and disinterested magistrates. Their duty and responsibility are to enforce the laws, to investigate, and to prosecute. *Katz v. United States, supra,* at 359–360, 88 S.Ct. at 515–516 (Douglas, J., concurring). But those charged with this investigative and prosecutorial duty should not be the sole judges of when to utilize constitutionally sensitive means in pursuing their tasks. The historical judgment, which the Fourth Amendment accepts, is that unreviewed executive discretion may yield too readily to pressures to obtain incriminating evidence and overlook potential invasions of privacy and protected speech.

Nor can the invasion of privacy which resulted in this case be excused as minimal. Although the flow of Choate's mail may not have been materially disrupted, the Supreme Court "has never sustained a search upon the sole ground that officers reasonably expected to find evidence of a particular crime and voluntarily confined their activities to the least intrusive means consistent with that end." *Katz v. United States, supra,* 389 U.S. at 356–57, 88 S.Ct. at 514.

Finally, the fact that the Postal Service is a government-sanctioned monopoly cannot be ignored. While one desiring to protect his privacy may be put to a choice as to whether or not to install a telephone,[19]

---

**18.** "All mail should bear the name and address of the actual sender to enable the Postal Service to return it (if returnable) when it is undeliverable . . . ." Postal Service Manual, Part 122.13.

**19.** The Ninth Circuit has held that there is no reasonable expectation of privacy as to the fact that telephone calls were placed on particular dates to particular phone numbers from a home or residence telephone. *See United States v. Baxter,* 492 F.2d 150, 167 (9th Cir. 1973), *cert. denied,* 416 U.S. 940, 94 S.Ct. 1945, 40 L.Ed.2d 292 (1974); *United States v. Fithian,* 452 F.2d 505, 506 (9th Cir. 1971). By specifically resting its conclusion on the common knowledge that business records are kept containing this information, the court nevertheless left persons desiring privacy the alternative of using pay telephone facilities, the very choice protected in *Katz.* Communication via the mails, at issue in this case, is much more closely akin to the pay phone booth situation: no records of communications are maintained by the carrier, and the anonymity invited and indeed required by the attachment of a prepaid stamp is to be contrasted with the personal accountability which accompanies the convenience of billing to a residence or business.

there are few alternatives to the mail. Surely, in a free society, citizens should be left at least one unfettered means of communication which cannot be invaded without the showing of probable cause necessary for a search warrant. To allow the government to give an absolute monopoly and then to use it to invade the privacy of the citizenry without the protection of judicial scrutiny is to license the blatant circumvention of constitutional rights.

Fundamental constitutional principles thus compel the conclusion that the use of a mail cover as part of the early investigation of Choate was illegal.

### 3. *The pervasiveness of the taint.*

■ A final question remains to be addressed: was any part of the evidence in this case obtained by means sufficiently distinguishable to be purged of the taint of the illegal mail cover? The Ninth Circuit held in *United States v. Bacall,* 443 F.2d 1050, *cert. denied,* 404 U.S. 1004, 92 S.Ct. 565, 30 L.Ed.2d 557 (1971), that the government should be given the opportunity to establish that the evidence it intends to use at trial was obtained from sources sufficiently independent of the illegality. The government is obligated to make such a showing by the preponderance of the evidence. *United States v. Cales,* 493 F.2d 1215 (9th Cir. 1974).

■ A full day of hearing was held on this question. The court concluded at that time, based on the evidence presented, that it was impossible to segregate the tainted from the untainted evidence. Counsel for the government conceded this point during later argument on the question of the legality of the mail cover.

Among the most significant information discovered during the course of the mail cover was the fact that defendant had an account with the United States National Bank. No other source of information on the existence of this account was even suggested. DEA Agent Williams agreed that this bank was a "rich vein of information." Internal Revenue Service Agent Roach stated that "substantial information" was obtained from investigation of this account, both concerning who was giving the defendant money and to whom he wrote checks. No comparable independent lead to information on Choate's assets has been shown. It was not disputed that the investigation was significantly intensified as a result of the lead to this bank account.

Nor was the discovery of the bank account a mere coincidence. Agent Williams specifically stated that he "was not having much luck in getting a seizure or progressing with a substantive case against Mr. Choate." Absent probable cause, therefore, he turned to the use of a mail cover for a warrantless fishing expedition. Before requesting the mail cover, he had approached the IRS with information he had been gathering concerning Choate's assets so that a tax investigation could be undertaken. The IRS did not wish to proceed at that time, but invited him to return later following further investigation. It is clear that he was very interested in information on Mr. Choate's assets, although that justification was not given to the postal authorities.

In short, under none of the *Bacall* tests can the government be said to have met its burden. It is clear from the testimony adduced at the hearing that all evidence sought to be introduced against the defendant in this case was derived from exploitation of leads derived from the illegal mail cover. The court has no choice. The motion to suppress is granted.

IT IS FURTHER ORDERED that the clerk forthwith serve copies of this opinion and order by United States mail upon counsel for the parties appearing in this action.